(No. 64107█)

WILLIAM LIPINSKI *et al.*, Appellants, v. THE CHICAGO BOARD OF ELECTION COMMISSIONERS *et al.*, Appellees.

*Opinion filed October 31, 1986.*

CLARK, C.J., and WARD, J., took no part.

Richard A. Devine and Bruce R. Meckler, of Phelan, Pope & John, Ltd., of Chicago (Burton S. Odelson, of counsel), for appellants.

Thomas E. Johnson, James P. Chapman and Cecile L. Singer, of Chicago, for appellees Betty G. Willhoite, Rev. Jesse W. Cotton and Mary E. Zuniga.

Judson H. Miner and Matthew J. Piers, Corporation

Counsel, Roger Pascal and Barbara E. Hermansen, of Schiff Hardin & Waite, and Hubert O. Thompson, of Watt & Thompson, all of Chicago, for appellee City of Chicago.

JUSTICE SIMON delivered the opinion of the court:

This appeal results from a proposed referendum for the November 4, 1986, election in the city of Chicago providing:

> "Shall the mayor, the treasurer and the clerk of the City of Chicago be elected on a non-partisan ballot, by at least a 50% majority vote, but if no candidate receives at least 50% of the votes cast for the respective office, then in a run-off election between the two candidates for the office who received the greatest number of votes for that office at the initial election?"

The referendum proposition (the nonpartisan referendum) was initiated by petition pursuant to section 28—7 of the Election Code (Ill. Rev. Stat. 1985, ch. 46, par. 28—7), and filed with the Chicago board of election commissioners (the board) on August 18, 1986, by William Lipinski, Anthony Haswell, Richard Mell, and Robert Molaro (the Lipinski plaintiffs).

Betty J. Willhoite, the Reverend Jesse W. Cotton, and Mary E. Zuniga (the Willhoite plaintiffs) filed a timely verified objector's petition challenging the proposed referendum (Ill. Rev. Stat. 1985, ch. 46, pars. 10—8, 28—4.) They claimed that the petition was not supported by the number of valid signatures necessary to initiate a referendum (Ill. Rev. Stat. 1985, ch. 46, par. 28—7). In addition, the Willhoite plaintiffs claimed that the referendum could not appear on any ballot because the proposition was fatally vague and ambiguous. They also argued that the Chicago city council had previously adopted resolutions authorizing three advisory referenda to be submitted to voters at the November election, and

under the "Rule of Three," which precludes "more than 3 public questions" from being "submitted to referendum with respect to a political subdivision at the same election" (Ill. Rev. Stat. 1985, ch. 46, par. 28—1), there was no room for the nonpartisan referendum on the November 4 ballot.

On September 3, 1986, the board decided (with one member dissenting) that while the "Rule of Three" prevented the nonpartisan referendum from appearing on the November ballot, it was eligible for submission to the voters at the consolidated primary election scheduled for February 24, 1987.

The Lipinski plaintiffs sought judicial review of the board's decision and *mandamus* relief to compel the board to place the nonpartisan referendum on the November ballot and to remove the Chicago city council's three advisory referenda from that ballot. The Willhoite plaintiffs sought judicial review of that portion of the board's decision certifying the nonpartisan referendum for the February 1987 consolidated primary election. The circuit court denied the relief requested by the Lipinski plaintiffs. It also ruled that although the board failed to conduct a full hearing on the Willhoite plaintiffs' objections, it would, rather than remanding the entire matter to the board for a complete hearing, expedite the election process by ruling on some of the objections regarding the sufficiency in law and content of the nonpartisan referendum. The court then held, *inter alia*, that the nonpartisan referendum presented a proper question and was neither vague nor ambiguous. It remanded the issue regarding the sufficiency of the signatures on the initiating petition to the board for a full hearing. The effect of the circuit court ruling was to deny placement of the nonpartisan referendum on the November 4, 1986, ballot and to leave open the question of whether the referendum should be placed on the February 24, 1987, ballot.

The circuit court also found under Supreme Court Rule 304 (103 Ill. 2d R. 304) that there was no just reason to delay enforcement or appeal. All parties asked this court to accept a direct and expedited appeal under our Rule 302(b) (94 Ill. 2d R. 302(b)). We ordered briefs filed on an expedited basis, took the appeal without oral argument, and on October 1, 1986, entered the following order (Chief Justice Clark and Justice Ward not participating):

> "The judgment of the circuit court, to the extent that it affirmed the decision of the Chicago board of election commissioners that the nonpartisan election referendum not be placed on the November 4, 1986 ballot, is affirmed. A written opinion will follow."

The issues presented to this court are: (1) Is the nonpartisan referendum proposition vague and ambiguous and therefore fatally defective? (2) Does the city of Chicago have authority to initiate advisory referenda? and (3) Is the nonpartisan referendum barred from the November ballot under the "Rule of Three?" Our conclusion with respect to the first issue makes it unnecessary to address the other two issues.

Article VII, section 6(f), of the Illinois Constitution gives each home rule unit "the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law." (Ill. Const. 1970, art. VII, sec. 6(f).) In *Leck v. Michaelson* (1986), 111 Ill. 2d 523, this court recently considered this constitutional provision and concluded that it requires voters to approve "a *coherent* scheme for altering the election of their officials." (Emphasis added.) (111 Ill. 2d 523, 530.) The holding of *Leck* is clear: A referendum submitted under the provisions of article VII, section 6(f), must be able to "stand on its own terms"; if the referendum submitted to voters is not self-executing—leaving gaps to be filled by either the

legislature or municipal body—then "[j]ust what was approved by the voters [in the referendum proposition] is uncertain." (111 Ill. 2d 523, 530.) Because the referendum seeking to change the manner of selecting municipal officers at issue in *Leck* required additional provisions "not clearly contemplated by the terms of [the referendum] proposition" (111 Ill. 2d 523, 528), we held that it was vague and ambiguous, and therefore invalid.

The referendum proposition in the instant case suffers from infirmities similar to those which doomed the referendum examined in *Leck*, and the Election Code does not supply the answers necessary to make the referendum self-executing. The proposition fails to specify when it would take effect—at the 1987 election of city officials, or at a subsequent one. Since the proposition is mute regarding the election to which it would first apply, we have no way of determining the intent of those who signed the initiating petition with respect to this important but omitted detail. Similarly, should the referendum be submitted to the voters, their intent regarding when the referendum should take effect also could not be be ascertained. Whether the nonpartisan election would commence in 1987, or at a later election, however, could not only significantly affect the outcome of the vote, but also could create a constitutional problem.

Specifically, the Lipinski plaintiffs contend that the initial nonpartisan election would be held on February 24, 1987 (see Ill. Rev. Stat. 1985, ch. 46, pars. 2A—1.1(b), 2A—1.2(d)), but were the nonpartisan election conducted on that date, the time for candidates to circulate their nominating petitions would be drastically reduced. Petitions for candidates for the February 24, 1987, election must be filed between December 8, 1986, and December 15, 1986. (Ill. Rev. Stat. 1985, ch. 46, par. 10—6; see also Chicago Board of Election Commissioners 1987 Election Calendar.) The Election Code, however, allows

each candidate for office to circulate a nominating petition commencing "90 days preceding the last day provided *** for the filing of such petition." (Ill. Rev. Stat. 1985, ch. 46, par. 10—4.) This means that candidates throughout the State running at the time of the February 1987 consolidated primary election could begin circulating petitions on September 16, 1986. Were the nonpartisan referendum adopted at the November 4, 1986, election and applied to the February 24, 1987, election date, however, candidates for municipal offices in Chicago could not start to circulate their petitions until November 5, 1986, or whatever later date the proper authorities might certify the adoption of the nonpartisan referendum. The result would be that the time for circulating nominating petitions would be reduced from 90 days (September 16 to December 15) to at most 40 (November 5 to December 15) and perhaps fewer days. The nonpartisan referendum, by depriving candidates seeking office in the city of Chicago from having the same time to circulate their nominating petitions as other candidates for office, runs afoul of article III, section 4, of the Constitution, which mandates that laws governing conduct of elections be "general and uniform." Ill. Const. 1970, art. III, sec. 4.

Along with the significant reduction in the number of days available for circulating nominating petitions if the first nonpartisan election is held in February 1987, the number of signatures required to become a nonpartisan candidate would be substantially greater than under the existing partisan election system. The nonpartisan referendum is silent with respect to how many signatures are needed to get on the nonpartisan ballot. In this circumstance the Election Code refers us to its requirements for filing independent party petitions. (See Ill. Rev. Stat. 1985, ch. 46, pars. 10—3, 10—3.1.) An independent party candidate must obtain the signatures of "not less than

5%, nor more than 8% *** of the number of persons, who voted at the next preceding regular election in such *** political sub-division in which such *** political sub-division voted as a unit for the election of officers to serve its respective territorial area," provided that the number not exceed 25,000. (Ill. Rev. Stat. 1985, ch. 46, par. 10—3.) Five percent of the number of persons who voted in the 1983 mayoral election exceeds 25,000; consequently, under the Election Code any nonpartisan candidate for mayor, treasurer or clerk of Chicago would be required to file a minimum of 25,000 signatures to have his name placed on the ballot. That number of signatures would be approximately a 500% increase over the number currently required to file a nominating petition under the partisan system for Democratic candidates for mayor, treasurer and clerk, and more than an 800% increase for Republican candidates. The increase, while dramatic, does not invalidate the nonpartisan referendum because the Election Code, in the absence of any other provision controlling particular nonpartisan elections, supplies an answer regarding the number of signatures required. Whether those who might vote for the nonpartisan referendum—with perhaps the idea of opening up the municipal election process—would be aware that it would be much more difficult to become a candidate for municipal office in Chicago is, however, a matter of concern.

In addition, like the invalid referendum proposition in *Leck*, this referendum could shorten the incumbent mayor's term of office. Both the Illinois Municipal Code and the Election Code provide that the mayor of the city of Chicago is elected to a four-year term. (Ill. Rev. Stat. 1985, ch. 24, par. 21—5; Ill. Rev. Stat. 1985, ch. 46, par. 2A—25.) The Illinois Municipal Code states that the mayor "shall hold his office for four years beginning at noon on the first Monday of the month following his

election, and until his successor is elected and qualified."
(Ill. Rev. Stat. 1985, ch. 24, par. 21—5; see also Ill. Rev.
Stat. 1985, ch. 46, par. 2A—25.) If a nonpartisan candi-
date for mayor were elected in February, as the nonpar-
tisan referendum provides he might be, he could attempt
to take office on the first Monday in March. The incum-
bent mayor, however, who was elected to a four-year
term, took office on April 29, 1983. Thus, if the initial
nonpartisan election is held on February 24, 1987 (Ill.
Rev. Stat. 1985, ch. 46, pars. 2A—1.1(b), 2A—1.2(d)), the
nonpartisan referendum might result in shortening the
term of the incumbent mayor in contradiction of the
statutes under which he was elected.

Finally, the nonpartisan referendum is ambiguous on
its face because of its use of the phrase "50% majority
vote." The term "50% majority vote" is self-contradic-
tory; a majority is "a number greater than half of a to-
tal" (Webster's Third New International Dictionary 1363
(1971)), and must therefore be greater than 50%. Adding
to the confusion is the next phrase in the nonpartisan
referendum—"but if no candidate receives at least 50%
of the votes cast for the respective office"—which sug-
gests that one who receives less than a majority would
be elected at the initial election. Because of these contra-
dictions, the nonpartisan referendum fails to clearly in-
form the petition signers, as well as the voters, what is
needed for election without a runoff—a majority vote or
only 50% of the votes cast. The proposition is therefore
too vague and ambiguous to satisfy the guidelines an-
nounced in *Leck*.

The nonpartisan referendum is also fatally vague and
ambiguous because it fails to deal with the possibility
that in the initial election one candidate would receive
the highest number of votes, but less than 50%, while
the next two highest candidates would each receive an
equal number of votes. The nonpartisan referendum does

not give us any guidance on how to determine who would be eligible to participate in the runoff. Section 23—27 of the Election Code (Ill. Rev. Stat. 1985, ch. 46, par. 23—27), which provides for an election by lot where there is a tie vote, does not govern because it applies only to candidates who receive the highest number of votes, not to those who receive the second highest, and it also applies to filling an office rather than gaining a place on a runoff ballot. The Cities and Villages Act provides that if such a result occurs in the election of aldermen of the city of Chicago, the three highest participate in the runoff and the election is won by the highest vote getter in the runoff. (Ill. Rev. Stat. 1985, ch. 24, par. 21—26.) We find no comparable provision in the Election Code that could be applied to the nonpartisan election for mayor, treasurer and clerk. Besides, the nonpartisan referendum expressly contemplates a runoff election between only two candidates. If three candidates were included in the runoff election, who, in view of the nonpartisan referendum requirement for a "50% majority vote," whatever that may be, would win if none of the three candidates received even half of the votes in the runoff?

In *Leck v. Michaelson* (1986), 111 Ill. 2d 523, 530, we held that referenda propositions which require changes not clearly contemplated by the terms of the proposition are constitutionally defective. As in *Leck*, the nonpartisan referendum would have to be "interpreted, supplemented and modified in order to be implemented. Because the referendum could not stand on its own terms, however, the voters *** cannot be said to have approved a coherent scheme for altering the election of their officials, which is what section 6(f) [of article VII of the Constitution] requires." (*Leck v. Michaelson* (1986), 111 Ill. 2d 523, 530.) The nonpartisan referendum proposition is too vague and ambiguous to qualify as a binding

referendum either at the November 4 election, or at any subsequent election, because it leaves in its wake significant questions unanswered and details which conflict with the Election Code.

*Hoogasian v. Regional Transportation Authority* (1974), 58 Ill. 2d 117, which is not cited by any of the parties, is consistent with the conclusion we reach. The referendum proposition there, concerning the creation of the Regional Transportation Authority (RTA), was initiated by a legislative act which prescribed the wording of the proposition to be submitted to the voters. This court held that the referendum was neither vague nor ambiguous. It concluded that although the proposition submitted to the voters did not specifically refer to the statute or include the details regarding the organization and establishment of the RTA, voters could educate themselves by consulting the statute which contained all pertinent details, including the date the RTA would come into existence. With respect to the nonpartisan referendum, there is nothing voters can consult to find out when the first nonpartisan election would be held or how the potential shortening of the mayor's term would be resolved. In sum, the referendum in the instant case is not self-executing. Neither the nonpartisan referendum nor whatever details are supplied by the Election Code are comparable to the entire and coherent statutory scheme examined in *Hoogasian.*

The nonpartisan referendum is also ineligible to appear on any election ballot as an advisory proposition. The petitions supporting this referendum state that they were signed pursuant to article VII, section 6(f), of our State Constitution (Ill. Const. 1970, art. VII, sec. 6(f)). That article gives home rule units the authority to alter their manner of selecting officers only as approved by referendum. We read this article to pertain only to binding referenda, for it refers to approval, rather than con-

sideration, of a change in the manner of selecting officers. Since the initiating petitions refer to article VII, section 6(f), the signatures on the petitions are valid only in support of a binding proposition. Further, the plaintiffs state that their referendum was initiated pursuant to section 28—7 of the Election Code (Ill. Rev. Stat. 1985, ch. 46, par. 28—7), which governs only binding referenda. For these reasons the nonpartisan referendum does not qualify for placement on any ballot as an advisory referendum.

We therefore affirm the order of the circuit court insofar as it held that the referendum could not appear on the November 4 ballot. The portion of the circuit court order reversing the board's decision to certify the referendum for the February 24, 1987, consolidated primary election is also affirmed, but that portion of its order remanding the case to the board to determine the validity of the initiating petition is vacated as moot.

*Order affirmed in part*
*and vacated in part.*

CLARK, C.J., and WARD, J., took no part in the consideration or decision of this case.