(No. 65525.

LEAGUE OF WOMEN VOTERS OF PEORIA *et al.*, Appellants, v. THE COUNTY OF PEORIA *et al.*, Appellees.

*Opinion filed December 30, 1987.—Modified on denial of rehearing April 5, 1988.*

238

SIMON, J., and CLARK, C.J., dissenting.

Joseph Z. Sudow, Phillip B. Lenzini, Laurie M. Judd and David Dubicki, of Peoria (Kavanagh, Scully, Sudow, White & Frederick, P.C., of counsel), for appellants.

John A. Barra, State's Attorney, and Roberta L. Szydlowski, Assistant State's Attorney, of Peoria, for appellees County of Peoria *et al.*

Ronald J. Weber, of Froehling, Taylor & Weber, of Canton, for intervenors-appellees Betty A. Menold *et al.*

JUSTICE MORAN delivered the opinion of the court:

Plaintiffs, the proponents of a successful Peoria County referendum, filed in the circuit court of Peoria County a complaint to obtain a writ of *mandamus* commanding the defendants, the County of Peoria and Mary E. Harkrader as Peoria County clerk, to implement and enforce the referendum. During the circuit court proceedings, 10 incumbent members of the Peoria County Board were allowed to intervene and joined defendants in moving to dismiss the complaint. The circuit court dismissed the complaint with prejudice. We allowed a direct appeal to be taken to this court under Rule 302(b) (107 Ill. 2d R. 302(b)).

The issues presented for review are: (1) whether, under sections 3(b), 4(c) or 7(2) of article VII of the Illinois Constitution, the electorate of a county can change by referendum both the method of electing county board members from multimember to single-member districts and the number of county board members; (2) whether a county-wide referendum attempting to change both the method of electing county board members and the number of members is valid and enforceable when it is in apparent conflict with the State reapportionment statutes (Ill. Rev. Stat. 1985, ch. 34, par. 831 *et seq.*); (3) whether, if such a referendum is valid, the county and county clerk have a duty to implement the referendum, and if so, what is the extent of their respective duties.

The relevant facts as alleged in the complaint are not in dispute. A Peoria County resolution, adopted by the Peoria County Board and filed June 9, 1981, provides in pertinent part:

"6. That Peoria County shall be divided into nine (9) County Board Districts for election purposes.

* * *

9. That from each of the nine (9) County Board Districts, three (3) County Board Members shall be elected thereby making the size of the Peoria County Board twenty-seven (27) members." (Peoria County Resolution, pars. 6, 9 (June 9, 1981).)

Article II, section 2—16, of the Code of Peoria County presently provides:

"The county board shall be composed of twenty-seven (27) members with three (3) members elected from each of the nine (9) county board districts established by the county board." Code of Peoria County, art. II, §2—16 (1982).

On August 11, 1986, plaintiffs filed with defendant Harkrader, the Peoria County clerk, a petition for submission of a public question pursuant to section 28—7 of

the Election Code (Ill. Rev. Stat. 1985, ch. 46, par. 28—7). The petition requested submission of the following proposition to Peoria County voters at the November 4, 1986, general election:

"Shall the number of members of the Peoria County Board be reduced from twenty-seven (27) to nine (9), one member to be elected from each district? Provided, the change shall be effective in the 1988 election, at which time nine (9) members shall be elected as described above to replace all members then in office. Following the 1988 election, the newly elected members shall draw lots, with five (5) members to be chosen to serve four-year terms and four (4) members chosen to serve two-year terms. Subsequent terms of office shall be four (4) years."

No one objected to plaintiffs' petition.

The proposition appeared on the November 1986 ballot. 29,988 voted yes and 11,517 voted no. After the November election, no election contest was filed, and no recount was requested.

In December 1986, plaintiffs made several written requests to defendants that the referendum results be implemented. The defendants have failed to act in response to those demands.

Plaintiffs argue that under article VII of the Illinois Constitution, the electors may by county-wide referenda: (1) change the method of electing county board members (Ill. Const. 1970, art. VII, §3(b)); (2) eliminate or change the terms of office and manner of selection of any county office (Ill. Const. 1970, art. VII, §4(c)); and (3) adopt, alter and repeal their forms of local government provided by law (Ill. Const. 1970, art. VII, §7). They further argue that each of the above constitutional provisions is sufficient in itself to authorize the Peoria County referendum that is before this court. Plaintiffs also assert that the Peoria County referendum is coherent and self-executing as required by *Lipinski v. Chicago Board*

*of Election Commissioners* (1986), 114 Ill. 2d 95. They conclude that the referendum is valid and enforceable and that defendants have a duty to implement the referendum. Specifically, plaintiffs request a writ of *mandamus* commanding the County of Peoria to amend article II, §2—16, of the Code of Peoria County, and the resolution of Peoria County filed June 9, 1981, to read in conformity with the referendum. They further request a writ of *mandamus* commanding Mary E. Harkrader as Peoria County clerk to: prepare appropriate campaign and election materials implementing the single-member-district method of election; notify all interested persons that there will be only single-member districts in Peoria County for the 1988 election; notify all incumbent county board members that their terms of office expire when their successors are elected in 1988; and to notify all interested persons that the nine newly elected board members in 1988 will be subject to a draw of lots for five four-year terms and four two-year terms.

Defendants respond that the determination of the number of county board members is a power reserved exclusively to the county board under section 3(a) of article VII of the Illinois Constitution. They also contend that the referendum does not allow for reapportionment to comply with the constitutional requirement of "one man, one vote" as implemented by Illinois State statute (Ill. Rev. Stat. 1985, ch. 34, par. 831 *et seq.*). Finally, defendants argue that even if the referendum is valid and enforceable, a writ of *mandamus* would still not be appropriate because neither the County of Peoria nor the county clerk has a legal duty to perform the actions requested by plaintiffs. The intervenors basically echo the arguments of defendants.

*Mandamus* is not a writ of right but is awarded only in the exercise of sound judicial discretion in accord with legal principles. (*People ex rel. Cannella v. City of Chi-*

*cago* (1955), 7 Ill. 2d 416, 418.) *Mandamus* is appropriate only where there is a clear right to the requested relief, a clear duty on the part of the respondent to act, and clear authority in the respondent to comply with the terms of the writ. (*In re Claudia K.* (1982), 91 Ill. 2d 469, 476.) Therefore, in this case, plaintiffs must show not only that the referendum is valid and enforceable, thus giving plaintiffs the right to relief, but also that the County of Peoria and the county clerk have the duty to perform the requested actions.

To be valid and enforceable, a referendum must be authorized by article VII of the Illinois Constitution or by law. (Ill. Const. 1970, art. VII, §11.) The Peoria County referendum attempts to accomplish two objectives: first, to elect county board members from single-member districts rather than multimember districts; and, second, to reduce the number of county board members from 27 to 9. Those objectives are separate and distinct under the facts of this case. Defendants concede the authority of the electorate to achieve the first objective by referendum. The central question, therefore, is whether article VII grants the electorate the authority to achieve the second objective, that is, to fix by referendum the number of county board members.

Resolution of that question requires interpretation of various constitutional provisions. The meaning of a constitutional provision depends on the common understanding of the citizens who, by ratifying the Constitution, gave it life. (*Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 492; *People ex rel. Cosentino v. County of Adams* (1980), 82 Ill. 2d 565, 569; *Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 222.) This understanding, however, is best determined by referring to the common meaning of the words used. (*Kalodimos*, 103 Ill. 2d at 492-93; *Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 464.) If

ambiguities remain after consulting the language of the provision, it is appropriate to consult the debates of the delegates to the constitutional convention to ascertain the meaning which the delegates attached to those provisions. (*Kalodimos*, 103 Ill. 2d at 493; *Client Follow-Up Co.*, 75 Ill. 2d at 220.) The reason is that it is only with the consent of the convention that such provisions are submitted to the voters in the first place. *Kalodimos*, 103 Ill. 2d at 493.

In this case, there are four relevant constitutional provisions: sections 3(a), 3(b), 4(c) and 7 of article VII of the Illinois Constitution. We shall take each section in turn.

## SECTION 3(a)

Section 3(a) provides:

"(a) A county board shall be elected in each county. The number of members of the county board shall be fixed by ordinance in each county within limitations provided by law." (Ill. Const. 1970, art. VII, §3(a).)

The plain meaning of section 3(a) is that the number of county board members is determined by the county board and not by referendum. The use of the term "shall" requires that each county enact ordinances fixing the number of county board members. That power to fix the number is limited only by "law."

Plaintiffs assert that the common meaning of "law" includes a successful referendum and thus section 3(a) allows voters to place limitations on the number of county board members by referendum. However, not all "successful" referenda will be given the effect of law. For example, certain referenda that are not self-executing will not be enforced. (*Leck v. Michaelson* (1986), 111 Ill. 2d 517. See also *Lipinski v. Chicago Board of Election Commissioners* (1986), 114 Ill. 2d 95.) Referenda not expressly authorized by the Illinois Constitution will also

not be given the effect of law. (Ill. Const. 1970, art. VII, §11. See also *Coalition for Political Honesty v. State Board of Elections* (1977), 65 Ill. 2d 453 (Illinois Constitution limits popular initiatives (referenda) to amendments whose subjects would effect both the structure and procedure of the legislature; initiative proposal which did not meet that requirement held invalid).) Therefore, plaintiffs' assertion is at best only partially acceptable; a referendum that is not authorized by the Illinois Constitution or that is otherwise invalid cannot be a "law."

Section 3(a) does not expressly authorize a referendum to fix the number of county board members. Therefore, even assuming that the term "law" as used in article VII would include a valid, authorized, successful referendum, section 3(a) does not by itself provide the necessary authority for a referendum. The authority for a referendum to fix the number of county board members must come, if at all, from elsewhere—in this case, either sections 3(b), 4(c) or 7 of article VII.

### SECTION 3(b)

Plaintiffs concede that a county board has the authority to fix the number of its members but assert that that authority is not exclusive. Plaintiffs contend that section 3(b) of article VII gives the electorate the power to change the number of county board members by referendum.

Section 3(b) provides:

"(b) The General Assembly by law shall provide methods available to all counties for the election of county board members. No county, other than Cook County, may change its method of electing board members except as approved by county-wide referendum." (Ill. Const. 1970, art. VII, §3(b).)

Plaintiffs' construction would be contrary to the plain meaning of section 3(b). A particular "method" of election provided by the General Assembly may be used to elect many different numbers of county board members. The number of members elected is independent of the method of election and a change in method does not always necessarily result in a change in number.

Any doubt as to the voters' intent in ratifying section 3(b) is resolved by reviewing section 3(c). Section 3(c) provides in relevant part:

> "(c) Members of the Cook County Board shall be elected from two districts—Chicago and that part of Cook County outside Chicago, unless (1) a different method of election is approved by a majority of votes cast in each of the two districts in a county-wide referendum or (2) the Cook County Board by ordinance divides the county into single member districts from which members of the County Board resident in each district are elected." (Ill. Const. 1970, art. VII, §3(c).)

Section 3(c) thus defines two possible "methods of election" available to Cook County, the first separating Cook County into two districts—Chicago and that part of Cook County outside Chicago—and the second dividing the county into single-member districts without regard to the city limits of Chicago. As can be seen, the number of county board members is not a consideration or element in either method of election.

The conclusion that the phrase "method of election" does not include the number of county board members is amply supported by the records of the framers' debates. Section 3(b) was originally presented to the constitutional convention as committee proposal 6.3, which provided that "plans of election shall not be changed unless approved by county-wide referendum." (7 Record of Proceedings, Sixth Illinois Constitutional Convention 1696 (hereafter Proceedings).) (The Committee on Style,

Drafting and Submission changed the term "plans" to "methods" as a matter of style to better reflect the drafters' intent that redistricting and reapportionment would not be done by referendum but rather by the county boards. (See 7 Proceedings 1983.)) In the debate following the first reading of proposal 6.3 (now section 3(b)), the following colloquy took place.

"MR. A. LENNON: Well, how would we continue to deal with the shifting population if we wanted to comply with one man—one vote at a later date? Would we have to have the referendum?

MRS. ANDERSON: No. You are talking about conforming to reapportionment.

* * *

MRS. ANDERSON: This [reapportionment] is not a change in the plan. It is not a basic change in either single-member districts, multi-member districts, or this type of thing. It would be a basic change in the plan that would have to go to referendum.

MR. A. LENNON: *Would the total number of members of the county board be a change in the plan?*

MRS. ANDERSON: *No.*

MR. A. LENNON: We could change the total number?

MRS. ANDERSON: That is 6.2 [now section 3(a)], yes.

MR. A. LENNON: And we could change the total number and we could change the districts.

MRS. ANDERSON: The number of districts.

MR. A. LENNON: But we could not change single or multimember districts.

MRS. ANDERSON: Without a referendum." (Emphasis added.) (4 Proceedings 3229-30.)

Delegate Anderson later added:

"MRS. ANDERSON: *** In the first sentence of 6.3 the word 'plans' is defined in the second phrase there which may—or clause—which may include election at large or by districts.

You have to differentiate between the redrawing of—outside of Cook—the redrawing of district lines to conform to one man—one vote, and what this is referring to when we talk about a plan of election, it's basically whether you are going to change from a single-member district to a multimember district or go from at large to a single-member district." 4 Proceedings 3233.

Therefore, based on the language of section 3(b) and the floor debates, we conclude that the referendum power to change the method of election of county board members as reserved by the electorate under section 3(b) of article VII of the Illinois Constitution does not include the power to fix the number of county board members.

Plaintiffs assert that such a conclusion would result in a severe limitation in the referendum power to change the method of election. According to plaintiffs, to change Peoria County from multimember districts to single-member districts by referendum and not at the same time change the number of county board members, the referendum would have had to include a change from 9 districts to 27 single-member districts. Plaintiffs conclude that the referendum would thus have to include a legal description of the 27 new districts, properly reapportioned to comply with one man, one vote requirements.

Such a task is, of course, practically impossible to perform through the referendum powers. That is precisely why section 3(a) gives the responsibility of reapportionment and redistricting to the county board, as clearly indicated by the language of section 3(a) and the floor debates set forth above. Plaintiffs are confusing the role of the voters with that of the county board. The only role of the electorate in a referendum under section 3(b) is to choose between at-large, single-member or multimember district elections or any other appropriate

method of election. A referendum under section 3(b) need not even mention the number of county board members, or districts. After the method of election is determined by the voters, it is then the role of the county board to determine the appropriate number of members and districts.

### SECTION 4(c)

Plaintiffs' reliance on section 4(c) of article VII as authority for the Peoria County referendum is similarly misplaced. Section 4(c) provides in relevant part:

"Any office may be created or eliminated and the terms of office and manner of selection changed by county-wide referendum." (Ill. Const. 1970, art. VII, §4(c).)

The first clause of that sentence in section 4(c)—"any office may be created or eliminated"—does not apply to county board members. The office of county board member cannot be created or eliminated by referendum because it was both created and mandated by section 3(a), which requires that a "county board shall be elected in each county" (Ill. Const. 1970, art. VII, §3(a)). Merely reducing the number of county board members would not constitute the elimination of the office of county board member; as long as there is one county board member, the office exists. Increasing the number of county board members would under a similar analysis not constitute a creation of the office of county board member.

The power to change by referendum the terms of office and manner of selection of county officers also does not authorize the Peoria County referendum. The common meaning of "term of office" is the duration of office—one year, two years, etc. The Peoria County referendum does not seek to change the number of years county board members hold office. The meaning of the phrase "manner of selection" may include "method of

election." However, to the extent the definition of "manner of selection" goes beyond that of "method of election," the former is not applicable to county board members because, under section 3(a), county board members must be elected (Ill. Const. 1970, art. VII, §3(a)). Therefore, based on our analysis of "method of election" under section 3(b), "manner of selection" under section 4(c) also does not give the electorate authority to fix the number of county board members by referendum.

The pertinent holdings of the cases cited by plaintiffs, *Clarke v. Village of Arlington Heights* (1974), 57 Ill. 2d 50, and *Taylor v. County of St. Clair* (1974), 57 Ill. 2d 367, are distinguishable from the case presently before us. In *Taylor*, the chairman of the county board was originally selected by the county board from among its members. A referendum adopted by the county required that the chairman be elected by the voters at large. The issue in *Taylor* involved the manner of selection of a county board chairman, not a change in the number of county board members. There is no relation between those two issues which would be relevant to the case before us. Therefore, *Taylor* is not controlling here.

In *Clarke*, the Village of Arlington Heights approved by referendum a proposal to increase the number of village trustees from six to eight. The Illinois Municipal Code limited the number of trustees to six. (Ill. Rev. Stat. 1971, ch. 24, par. 3—5—2.) The Village of Arlington Heights is a home rule municipality and section 6(f) of article VII of the Illinois Constitution provides that a "home rule municipality shall have the power to provide for its officers, their manner of selection and terms of office only as approved by referendum or as otherwise authorized by law." (Ill. Const. 1970, art. VII, §6(f).) The court held that the language of section 6(f) set forth

above gave the home rule unit referendum precedence over the Municipal Code, which was enacted prior to the adoption of our present constitution.

However, the number of county board members is treated differently than the number of officers of a home rule municipality under article VII of the Illinois Constitution. The number of officers of a home rule municipality is not mentioned anywhere in article VII other than by implication in section 6(f). On the other hand, section 3(a) specifically provides that the number of county board members shall be fixed by ordinance. Therefore, whereas there is no other constitutional provision to conflict with the court's interpretation of section 6(f) in *Clarke*, section 3(a) would be inconsistent with plaintiffs' construction of section 4(c).

The inconsistency which would arise between sections 3(a) and 4(c) if the referendum power under section 4(c) was found to include the power to change the number of county board members by referendum is succinctly set forth in the constitutional convention debates. The above-quoted sentence of section 4(c), presented as committee proposal 4.3, originally provided that any unit of local government "may by referendum provide for the *number* of its officers, their terms of office, the manner of selecting them, and their powers and duties." (Emphasis added.) (7 Proceedings 1665.) Delegate Lewis pointed out an inconsistency between proposal 4.3 and proposal 6.2 (now section 3(a)).

> "MR. LEWIS: Now if we go back to 4.3, it says, 'by referendum may provide for the number of its officers,' and yet in 6.2—
>
> ***
>
> MR. LEWIS: In 6.2 we provide that the ordinance may provide the number of officers.
>
> MRS. KEEGAN: Yes.
>
> MR. LEWIS: And within limitations by general law.

MRS. KEEGAN: Yes.

MR. LEWIS: But the ordinance will give the number, and let's say the ordinance fixed the number of five. Now in 4.3, which does apply to counties, we have what seems to be a conflicting referendum requirement to pick the number at five or six or seven. Is that not just a direct inconsistency?

MRS. KEEGAN: It may well be, Delegate Lewis. You may have discovered another discrepancy." 4 Proceedings 3150.

Proposal 4.3 was later amended to delete the reference to "number" and provided that units of local government "may by referendum provide for its officers, their terms of office, and the manner of selecting them." (See 4 Proceedings 3363.) Delegate Keegan explained the intent of the amendment:

"MR. LEWIS: Delegate Keegan, would I be correct that it is now the intention of the committee through this amendment that the number of officers would actually now be controlled by section 6.2, and that the number would not be a decision to be made by referendum?

MRS. KEEGAN: *** It is correct in terms of the number of the county board.

\*\*\*

MR. LEWIS: And this number was taken out solely because of the conflict with the county board?

MRS. KEEGAN: That's right." 4 Proceedings 3364.

If separate parts of a constitution appear to be in conflict, as sections 3(a) and 4(c) would be under plaintiffs' construction, courts should favor a construction which will render every provision operative. In addition, a specific constitutional provision will prevail over a general section if the two are incompatible. (*Walker v. State Board of Elections* (1976), 65 Ill. 2d 543, 556.) Proper constitutional construction thus requires that section 4(c) be interpreted as not including the authority to fix by referendum the number of county board members.

Therefore, the holding in *Clarke* under section 6(f) of article VII does not extend to section 4(c), as applied to county board members.

## SECTION 7(2)

Plaintiffs assert that even if section 4(c) does not provide authority for the voters to fix the number of county board members by referendum, then section 7(2) does. Section 7(2) provides:

> "Counties and municipalities which are not home rule units shall have only powers granted to them by law and the powers *** (2) by referendum, to adopt, alter or repeal their forms of government provided by law." Ill. Const. 1970, art. VII, §7(2).

In *Clarke v. Village of Arlington Heights* (1974), 57 Ill. 2d 50, the plaintiff presented a similar argument that a change in the number of village trustees from six to eight "resulted in a modification of its 'form of government' in derogation of legislative authority." (*Clarke*, 57 Ill. 2d at 54.) The court rejected that conclusion, finding that construing "form of government" to include a change in the number of village trustees would be contrary to the plain meaning of the language. 57 Ill. 2d at 54.

That portion of the holding of *Clarke* is directly analogous to the facts presented here. Plaintiffs' construction of section 7(2) to include within the meaning of the phrase "form of government" the number of county board members would be contrary to the common meaning of that phrase. Consequently, section 7(2) does not provide authority for the Peoria County voters' attempt to fix by referendum the number of county board members.

In summary, section 3(a) grants to the county board the authority to fix the number of its members within limitations provided by law, but does not by itself authorize a referendum to accomplish the same end. In ad-

dition, based on the language of sections 3, 4 and 7 of article VII of the Illinois Constitution, and the debates of the framers, it is apparent that the power of the voters under section 3(b) to change the method of election, under section 4(c) to change the manner of selection of county officers, and under section 7(2) to change the form of government does not include the authority to fix by referendum the number of county board members. Plaintiffs have not presented any convincing indications that we should ascribe a different meaning to those provisions. We therefore conclude that the Peoria County referendum is invalid and unenforceable to the extent it attempted to change the number of county board members.

The question becomes whether any portion of the Peoria County referendum can be given legal effect. The portion of the referendum attempting to change the method of election from multimember to single member districts would, *by itself*, be authorized under section 3(b) (Ill. Const. 1970, art. VII, §3(b)). However, we decline to enforce that portion of the referendum by itself after severing the invalid portion. It is impossible to determine whether the paramount concern of the voters was the size of the board or its method of election. Nor can we determine whether the electorate would have voted for a change in the method of election without being assured of a reduction in the number of county board members. A change in the method of election alone is simply not the proposal presented to the voters. We therefore decline to give any portion of the referendum binding, legal effect, and find that plaintiffs attained no rights as a result of that referendum.

In conclusion, plaintiffs have failed to show that they have a clear legal right to the relief requested. Therefore, the complaint for a writ of *mandamus* was properly dismissed based on that failure alone, and we need

not address the other issues presented. For the reasons stated, the circuit court is affirmed.

*Circuit court affirmed.*

JUSTICE SIMON, dissenting*:

I believe that the referendum presented here, overwhelmingly approved by Peoria County voters, is valid and enforceable, and I therefore respectfully dissent.

The majority acknowledges that the Peoria County voters have the power to change their county board from multimember to single-member districts. The opinion concludes, however, that the voters lack the referendum power to reduce the total number of board members, with the result of changing from a total of 27 members elected from nine three-member districts to nine members elected from nine single-member districts. In reaching its conclusion, the majority incorrectly holds that section 3(a) of article VII of the Illinois Constitution prohibits change in the number of county board members by referendum. Section 3(a) provides:

"(a) A county board shall be elected in each county. The number of members of the county board shall be fixed by ordinance in each county within limitations *provided by law*." (Emphasis added.) (Ill. Const. 1970, art. VII, §3(a).)

The initial question is whether a referendum may be considered a "law." Although until now no Illinois reviewing court has addressed this issue, numerous other courts have determined that a properly approved referendum is a law. (See, *e.g., Ohio ex rel. Davis v. Hildebrandt* (1916), 241 U.S. 565, 568, 60 L. Ed. 1172, 1176, 36 S. Ct. 708, 709; *Backman v. United States* (D.C.

---

*As Justice Simon was no longer on the Court when its opinion in this matter was modified on denial of rehearing, his dissent remains unchanged from the original filing.

1986), 516 A.2d 923, 926; *Convention Center Referendum Committee v. District of Columbia Board of Elections & Ethics* (D.C. 1981), 441 A.2d 889, 896; *Opinion of the Justices* (1941), 309 Mass. 631, 637, 35 N.E.2d 676, 680; *Iman v. Southern Pacific Co.* (1968), 7 Ariz. App. 16, 20, 435 P.2d 851, 855 ("When the people act in their legislative capacity through an initiative measure, their enactments are as much 'law' as those enacted by the legislature").) Consistent with these decisions, the definition of an "initiative," which under our constitution is interchangeable with "referendum," is "the power of the people to propose bills and laws, and to enact or reject them at the polls, independent of legislative assembly." Black's Law Dictionary 705 (5th ed. 1979).

In support of its narrow interpretation of "law" as meaning only enactments of the General Assembly, the majority points to the following language in section 6(f) of article VII: "only as approved by referendum or as otherwise authorized by law." (Ill. Const. 1970, art. VII, §6(f).) This language, however, supports the plaintiffs' argument that a referendum may be a law because use of the word "otherwise" indicates that a referendum is one of the ways of authorizing some action by law. The majority also relies on the fact that the phrase "the General Assembly shall provide by law" is used in article VII. This language, however, as I read it, simply indicates that legislative enactments are also included in the word "law" and that the provisions that include this language may only be acted on by the General Assembly.

It is clear that the word "law" in section 3(a) includes referenda, and therefore section 3(a) is not a bar to the Peoria County referendum. The referendum power envisioned by section 3(a) is found in section 3(b), where the voters retain the specific power to change the number of county board members by referendum. Section 3(b) provides:

"(b) The General Assembly by law shall provide methods available to all counties for the election of county board members. No county, other than Cook County, may change its method of electing board members except as approved by county-wide referendum." (Ill. Const. 1970, art. VII, §3(b).)

The majority acknowledges that under this provision the voters may, by referendum, change from multimember districts to single-member districts, as was done in Peoria County. The majority holds, however, that in changing from nine three-member districts to nine single-member districts, the voters may not change the total number of county board members from 27 to 9. The majority's stated reason for this anomalous result is that "[t]he number of members elected is independent of the method of election and a change in method does not always necessarily result in a change in number." (121 Ill. 2d at 246.) This statement, however, is not dispositive of the issue, because although it is true that a change in method does not *always* result in a change in number, in this case it did result in a change in number. It is obvious that a change in number of board members would often go hand in hand with a change from multimember to single-member districts. See, *e.g., Coalition for Political Honesty v. State Board of Elections* (1980), 83 Ill. 2d 236 (upholding referendum proposing change in Illinois House of Representatives to single-member districts and reduction in the number of representatives).

An examination of the official explanation of section 3 that was disseminated to the voters before they voted on whether to adopt the 1970 Constitution makes it clear that section 3(b), when read together with section 3(a), permits the voters to change by referendum the number of board members when they change from multimember to single-member districts. Although the majority relies on several statements made by the drafters of the 1970

Constitution in their debates, this court has previously stressed that it is citizens' intent in adopting a constitution that is the most probative evidence of how the document should be construed, not statements by individual delegates:

"It is possible to lift from the constitutional debates or almost any provision statements by a delegate or a few delegates which will support a particular proposition; however, such a discussion by a few does not establish the intent or understanding of the convention.

\* \* \*

Although the constitutional debates may often be helpful in understanding the meaning of doubtful constitutional provisions, the true inquiry concerns the understanding of its provisions by the voters who, by their vote, have given life to the product of the convention." (*Client Follow-Up Co. v. Hynes* (1979), 75 Ill. 2d 208, 221-22.)

(See also *Kalodimos v. Village of Morton Grove* (1984), 103 Ill. 2d 483, 492-93; *People ex rel. Consentino v. County of Adams* (1980), 82 Ill. 2d 565, 569; *Wolfson v. Avery* (1955), 6 Ill. 2d 78, 88.) The official explanation of section 3 as a whole, as disseminated to the voters, stated:

"This replaces Article X, Sections 5, 6, and 7, of the 1870 Constitution. *It simplifies the requirements of those sections and allows the form of county government to be changed by a vote of the people involved.* Subsection (c) provides a more flexible procedure for election of the members of the Cook County Board." (Emphasis added.) (7 Record of Proceedings, Sixth Illinois Constitutional Convention 2725.)

The official explanation stressed one point: the voters' power to change the form of county government through referendum. A change in the form of county government is a broad and all-inclusive concept. It may include a change in the number of county board members as well

as a change from multimember to single-member districts. If section 3 were intended to limit changes in the "form of county government" to changes from multimember to single-member districts or vice versa, while at the same time prohibiting any accompanying change in the number of board members, certainly this important restriction would have been spelled out in the official explanation. I do not think that the restrictions the majority opinion imposes on sections 3(a) and 3(b) are compatible with this broad and general explanation.

I believe that under section 3 the Peoria County voters had the power to change from multimember districts to single-member districts, which the majority concedes, and at the same time reduce the number of board members from 27 to 9. For the foregoing reasons, I respectfully dissent.

CHIEF JUSTICE CLARK joins in this dissent.