(No. 78198.—)

THE COMMITTEE FOR EDUCATIONAL RIGHTS *et al.*, Appellants, v. JIM EDGAR, Governor of the State of Illinois, *et al.*, Appellees.

*Opinion filed October 18, 1996.*

2

4

HARRISON, J., took no part.
FREEMAN, J., concurring in part and dissenting in part.

Robert J. Lenz, of Bloomington, C. Richard Johnson, Roger Pascal, Charles H.R. Peters and Jeffrey Bushofsky, of Schiff, Hardin & Waite, of Chicago, David C. Long, of Mill Valley, California, and Patricia A. Brannan and Paul A. Minorini, of Hogan & Hartson, of Washington, D.C., for appellants.

James E. Ryan, Attorney General, of Springfield (Barbara A. Preiner, Solicitor General, and Rita M. Novak, Assistant Attorney General, of Chicago, of counsel), for appellees.

Joan Marsh and Anne-Marie Eileraas, of Kirkland

& Ellis, and Karen Berman and Rosa Abreu, all of Chicago, for *amici curiae* League of Women Voters of Illinois and the Mexican American Legal Defense & Education Fund.

JUSTICE NICKELS delivered the opinion of the court:

This appeal draws us into the sensitive and controversial area of public school finance. The plaintiffs in this action are the Committee for Educational Rights (which consists of more than 60 school districts associated pursuant to an intergovernmental agreement), the boards of education of 37 school districts named individually, and a number of students and their parents. The defendants are Governor Jim Edgar, the State Board of Education and State Superintendent of Education Joseph A. Spagnolo. Plaintiffs brought this action in the circuit court of Cook County seeking a declaratory judgment that the statutory scheme governing the funding of public schools violates various provisions of the Illinois Constitution of 1970. The trial court dismissed the complaint and the appellate court affirmed. 267 Ill. App. 3d 18. The appellate court issued a certificate of importance under Supreme Court Rule 316 (155 Ill. 2d R. 316) giving rise to the present appeal. We affirm the appellate court, which affirmed the dismissal of plaintiffs' complaint.

## BACKGROUND

We begin with a general and vastly simplified description of those aspects of public school finance in Illinois that are germane to this appeal. Public schools receive funds from various federal, state and local sources. The controversy in the present case hinges on the relationship between funding derived from local property taxes and funds supplied by the state. Under the School Code (105 ILCS 5/1—1 *et seq.* (West 1994))

school districts are authorized to levy property taxes for various school purposes up to specified maximum rates. See, *e.g.*, 105 ILCS 5/17—2, 34—53 (West 1994). The voters of a school district may authorize higher property tax rates by referendum, but even with such voter approval the School Code places an upper limit on school property tax rates. 105 ILCS 5/17—3, 17—4, 17—5, 34—53 (West 1994). Obviously, the amount which a school district is able to raise through property taxes is determined by the taxable property wealth within the district. Wealthy districts—those with substantial taxable property wealth per pupil—are able to raise more revenue per pupil at a given tax rate than poor districts.

There are principally two categories of state financial assistance which supplement local property tax revenues and other local sources of funding. First, the state provides assistance to school districts in the form of categorical grants for a variety of specific purposes. See, *e.g.*, 105 ILCS 5/2—3.51 (West 1994) (reading improvement programs); 105 ILCS 5/2—3.65 (West 1994) (arts programs); 105 ILCS 5/18—7 (West 1994) (teacher retirement benefits); 105 ILCS 5/27—24.4 (West 1994) (driver education programs); 105 ILCS 5/29—5 (West Supp. 1995) (student transportation). School districts also receive distributions of general state aid from the state's common school fund pursuant to the formula set forth in section 18—8 of the School Code (105 ILCS 5/18—8 (West Supp. 1995)).

General state aid is distributed based on a weighted average daily attendance (ADA[1]) at schools within a particular district and on the equalized assessed valua-

---

[1] In computing the weighted ADA, students in grades 7 and 8 are counted as 1.05 students and those in grades 9 through 12 are counted as 1.25 students. 105 ILCS 5/18—8(A)(1)(a) (West Supp. 1995). The weighted ADA also applies a multiplier to low income students in the district. 105 ILCS 5/18—8(A)(1)(n) (West Supp.

tion (EAV) of property in the district. The general state aid formula is designed to enable districts with modest property tax bases to achieve a certain minimum level of funding per pupil. This minimum funding level, commonly known as the "foundation level," is computed by the State Board of Education based on the amount available for distribution from the common school fund. The foundation level represents a hypothetical "guaranteed" dollar amount of taxable property wealth per pupil (hereinafter, guaranteed EAV) (see 105 ILCS 5/18—8(A)(5)(a) (West Supp. 1995)) multiplied by a specified tax rate (hereinafter, foundation rate) (see 105 ILCS 5/18—8(A)(5)(d)(2) (West Supp. 1995)). The amount of general state aid per pupil that a particular district receives is calculated by subtracting the district's EAV per weighted ADA pupil from the guaranteed EAV and multiplying the difference by the foundation rate. The formula may be expressed as follows: general state aid per weighted ADA pupil = (guaranteed EAV − district EAV per weighted ADA pupil) x foundation rate. See 105 ILCS 5/18—8(A)(5)(d)(2) (West Supp. 1995). This formula is structured to provide that if a district levies property taxes at exactly the foundation rate, the sum of local revenues and general state aid will equal the foundation level. In order to receive full state aid under this formula, the district's local tax rates must equal or exceed a specified minimum "qualifying" rate (which is lower than the foundation rate)[2] but the amount of aid received does not otherwise depend on the actual local tax rates applied. See 105 ILCS 5/18—8(A)(5)(d)(1), (A)(5)(d)(2) (West Supp. 1995). Thus, to receive the full amount of general state aid the district must tax at or

---

1995).

[2] If the district taxes below the qualifying rate, its actual tax rate is substituted for the foundation rate in the above formula. 105 ILCS 5/18—8(A)(5)(d)(1) (West Supp. 1995).

above the "qualifying" rate. To achieve foundation level funding, the district must tax at the foundation rate. Where a district's local tax rate exceeds the foundation rate, the sum of local revenues and general state aid will exceed the foundation level.

The above method of distributing general state aid only applies in districts where the EAV per weighted ADA pupil is less than 87% of the guaranteed EAV. 105 ILCS 5/18—8(A)(5)(e) (West Supp. 1995). In wealthier districts, an alternative formula applies. The minimum amount of general state aid under the alternative formula is fixed at 7% of the foundation level. 105 ILCS 5/18—8(A)(5)(f) (West Supp. 1995).

In their five-count complaint, plaintiffs allege that under the present financing scheme, vast differences in educational resources and opportunities exist among the state's school districts as a result of differences in local taxable property wealth. During the 1989-90 school year, the average tax base in the wealthiest 10% of elementary schools was over 13 times the average tax base in the poorest 10%. For high school and unit school districts, the ratios of the average tax bases in the wealthiest and poorest districts were 8.1 to 1 and 7 to 1, respectively, during the 1989-90 school year.

Plaintiffs allege in their complaint that the general state aid formula does not effectively equalize funding among wealthy and poor districts. While the general state aid formula ensures minimum funding at the foundation level, the wealthiest districts are able to raise funds through property taxes considerably in excess of the foundation level. Moreover, the provision of a minimum grant—equal to 7% of the foundation level—to even the wealthiest school districts is counterequalizing.

Plaintiffs allege that disparities among wealthy and poor districts are reflected in various measures of

educational funding; in several "key indicators" of educational quality (such as the percentage of teachers with master's degrees, teacher experience, teacher salaries, administrator salaries and pupil/administrator ratios); and in a comparison of the facilities, resources and course offerings in two neighboring school districts with dramatically disparate tax bases. According to the complaint, these disparities are attributable to variations in property wealth rather than tax effort; on average, the poorest school districts tax at higher rates than the wealthiest.

Based on these allegations, in counts I through III plaintiffs seek a declaratory judgment that to the extent that the statutory school finance scheme "fails to correct differences in spending and educational services resulting from differences in [local taxable property wealth]" the scheme violates our state constitution's equal protection clause (count I), prohibition against special legislation (count II) and education article (count III). Ill. Const. 1970, art. I, § 2; art. IV, § 13; art. X, § 1.

Counts IV and V of the complaint pertain to the educational opportunities available to certain socioeconomically disadvantaged children who are at risk of academic failure (at-risk children). Plaintiffs allege that at-risk children frequently exhibit educational deficits and require early intervention in order to succeed academically. Section 2—3.71 of the School Code (105 ILCS 5/2—3.71 (West 1994)) provides for a grant program administered by the State Board of Education for the establishment of preschool educational programs addressing the needs of at-risk children. Plaintiffs allege that such programs are effective in correcting the educational deficits that at-risk children suffer, but grants under section 2—3.71 and other sources of funding are sufficient to provide such programs for only a fraction of the children who need them. Plaintiffs seek a

declaratory judgment that by failing to provide sufficient funding for preschool educational programs, the state's system for financing public education violates the equal protection clause (count IV) and education article (count V) of our state constitution.

The trial court dismissed plaintiffs' complaint for failure to state a cause of action. The appellate court affirmed the judgment of the circuit court and issued a certificate of importance pursuant to Supreme Court Rule 316. With leave of this court, the League of Women Voters of Illinois and the Mexican American Legal Defense and Education Fund have jointly filed an *amicus curiae* brief in support of plaintiffs. On appeal, plaintiffs do not challenge the dismissal of their special legislation claim. However, plaintiffs contend that the trial court erred in dismissing their claims under the equal protection clause and the education article.

## ANALYSIS

### I

We first consider the dismissal of plaintiffs' claims that the statutory system for financing public schools violates the education article of our state constitution. Section 1 of article X of the Illinois Constitution of 1970 provides:

"A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.

*The State shall provide for an efficient system of high quality public educational institutions and services.* Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.

The State has the primary responsibility for financing the system of public education." (Emphasis added.) Ill. Const. 1970, art. X, § 1.

Plaintiffs' challenge to the statutory system for

financing public schools is based on the emphasized language above. First, plaintiffs contend that because the system produces vast disparities in the level of funding and educational resources available to various school districts based on differences in local taxable property wealth, it is not "efficient" within the meaning of the constitution. Second, plaintiffs argue that school districts with low property tax bases are unable to provide a "high quality" education to their students due to inadequate funding. Third, plaintiffs contend that under the financing scheme, funding is insufficient to provide a "high quality" education to at-risk children.

Before proceeding, we note that plaintiffs' second argument is essentially raised for the first time on appeal. While in count III of their complaint plaintiffs allege that the quality of public education is *comparatively* better in wealthier districts, as we read the complaint there is no specific allegation that students (other than at-risk students) in districts with low taxable property wealth are deprived of a "high quality" education in normative terms. Because the theory that poor districts provide a normatively inadequate education was not raised in the trial court, we could properly treat it as waived. See *Eagan v. Chicago Transit Authority*, 158 Ill. 2d 527, 534 (1994) ("issues not raised in the trial court may not be raised for the first time on appeal"). We choose, however, to address the argument on the merits. The waiver rule is a limitation on the parties and not the jurisdiction of the courts. *Herzog v. Lexington Township*, 167 Ill. 2d 288, 300 (1995). Moreover, a reviewing court may consider an issue not raised in the trial court if the issue is one of law and is fully briefed and argued by the parties. *People ex rel. Daley v. Datacom Systems Corp.*, 146 Ill. 2d 1, 27 (1991); *Hux v. Raben*, 38 Ill. 2d 223, 225 (1967). As will be seen, plaintiffs' argument regarding the quality of education,

in normative terms, presents questions of law relative to the power of the courts to adjudicate such a claim. The controlling questions have been sufficiently briefed and argued to facilitate review on the merits. Furthermore, the questions presented are of substantial public importance, and we believe the public interest favors consideration of the merits. Accordingly, we will consider this argument, along with those issues properly preserved for review.

## A

We first consider plaintiffs' argument that the present school funding system is not "efficient" within the meaning of the constitution because it produces disparities in educational resources and services based on differences in local taxable property wealth. In plaintiffs' view, the efficiency requirement guarantees some measure of equality in educational funding and opportunity. Plaintiffs deny that they seek absolute uniformity in educational offerings or precisely equal spending for each pupil in the state. Plaintiffs would apparently approve variations in educational spending from district to district based on criteria such as local differences in the costs of resources and special educational needs in particular districts. However, plaintiffs maintain that a school district's property wealth is "educationally irrelevant" and is not a proper factor upon which to set the level of resources available to the district.

The trial and appellate courts rejected plaintiffs' argument that the efficiency requirement guarantees parity of educational funding and opportunity. The trial court emphasized that the framers of the 1970 Constitution had considered and rejected specific proposals for a constitutional provision designed to reduce funding disparities among districts by limiting the amount of funds that could be raised by local property taxes. The appellate court concluded that article X of the constitu-

tion "does not mandate equal educational benefits and opportunities among the State's school districts as the constitutionally required means of establishing and maintaining an 'efficient' system of free public schools." 267 Ill. App. 3d at 22.

As this case turns upon the meaning of constitutional language, a brief summary of the general principles of constitutional interpretation may be helpful. The meaning of a constitutional provision depends on the common understanding of the citizens who, by ratifying the constitution, gave it life. *League of Women Voters v. County of Peoria*, 121 Ill. 2d 236, 243 (1987); *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 492 (1984). This understanding is best determined by referring to the common meaning of the words used. *League of Women Voters*, 121 Ill. 2d at 243; *Kalodimos*, 103 Ill. 2d at 492-93. Where the language is unambiguous, it will be given effect without resort to other aids for construction. *Baker v. Miller*, 159 Ill. 2d 249, 257 (1994). However, if after consulting the language of a provision, doubt remains as to its meaning, it is appropriate to consult the debates of the delegates to the constitutional convention to ascertain the meaning they attached to the provision. *League of Women Voters*, 121 Ill. 2d at 243-44; *Kalodimos*, 103 Ill. 2d at 493.

"Efficient" has been defined as follows:

"1 : serving as or characteristic of an efficient cause : causally productive : OPERANT *** 2 : marked by ability to choose and use the most effective and least wasteful means of doing a task or accomplishing a purpose ***." Webster's Third New International Dictionary 725 (1981).

This definition does not inherently compel the conclusion that an "efficient system" of public schools necessarily involves statewide parity of educational opportunity and resources. However, we do not believe that the precise meaning of the word "efficient" as used in section 1 of the education article is entirely clear and

free from doubt, or that "efficient" could not conceivably be interpreted in the manner that plaintiffs claim. We note that the Court of Appeals of Maryland determined that Maryland's constitutional requirement that the General Assembly establish a "thorough and efficient" system of free public schools was "on its face *** plainly susceptible of more than one meaning." *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 619, 458 A.2d 758, 770 (1983). In determining whether the "thorough and efficient" provision required exact equality in per pupil funding and expenditures among Maryland's school districts, the *Hornbeck* court deemed it essential to consider the history underlying the enactment of the provision. *Hornbeck*, 295 Md. at 619-20, 458 A.2d at 770. Courts in other jurisdictions with similar constitutional efficiency provisions have also looked to sources beyond the language of the constitution to determine the meaning of those provisions. See *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 205-06 (Ky. 1989); *Edgewood Independent School District v. Kirby*, 777 S.W.2d 391, 394-96 (Tex. 1989); *Pauley v. Kelly*, 162 W. Va. 672, 681-89, 255 S.E.2d 859, 866-69 (1979); see also *Rose*, 790 S.W.2d at 221 (Vance, J., dissenting) ("It is because of [the] universal concern expressed by the delegates to the convention that I conclude that the word 'efficient' as used by them must include not only its dictionary definition but must also be construed to include the requirement of substantial equality of educational opportunity"). We shall likewise consider the history underlying the adoption of section 1 of the education article.

The education article of the 1970 Constitution originated as a proposal submitted by the education committee of the Sixth Illinois Constitutional Convention. 6 Record of Proceedings, Sixth Illinois Constitutional Convention 227 (hereinafter cited as Proceedings). At

the outset, we note that an introductory passage in the education committee's report on the proposed education article states, "[t]he opportunity for an education, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." 6 Proceedings 231. Considered in isolation, this statement might lend some credence to plaintiffs' position. However, this general statement of principle was not made in reference to the efficiency requirement or any other specific language in the proposed education article. Instead, as authority for this proposition the education committee report cites the landmark decision in *Brown v. Board of Education*, 347 U.S. 483, 98 L. Ed. 873, 74 S. Ct. 686 (1954), which was, of course, based on the equal protection clause of the fourteenth amendment of the United States Constitution. As explained below, specific references in the convention record to the efficiency requirement place the concept in a significantly different light.

The constitutional requirement that the state provide for an efficient system of high quality educational institutions and services corresponds to section 1 of article VIII of the 1870 Constitution, which stated, "The general assembly shall provide a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education." Ill. Const. 1870, art. VIII, § 1. Under the 1870 Constitution, this court consistently held that the question of the efficiency and thoroughness of the school system was one solely for the legislature to answer, and that the courts lacked the power to intrude. *People v. Deatherage*, 401 Ill. 25, 31 (1948) (and cases cited); *People ex rel. Taylor v. Camargo Community Consolidated School District No. 158*, 313 Ill. 321, 327-28 (1924) ("Whether [a provision governing detachment of territory from school districts] tends to affect adversely or favorably the

thoroughness and efficiency of the system of free schools is a legislative question which is not for our determination"); see also G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 400-01 (1969) ("It has been said that the 'thorough and efficient' requirement was solely a matter for legislative discretion and the courts will not look into it").

However, under a limited exception to this principle it was held that pursuant to the "thorough and efficient" requirement school district boundaries must be established so that the districts are compact and contiguous. See *People ex rel. Community Unit School District No. 5 v. Decatur School District No. 61*, 31 Ill. 2d 612, 613-14 (1964). As explained in *People ex rel. Leighty v. Young*, 301 Ill. 67, 71 (1921), "[i]t cannot be said that a system which places the school house at a point so remote that the children of school age cannot reach it conveniently is either thorough or efficient." School districts organized in contravention of the requirements of compactness and contiguity have been held invalid. See, *e.g.*, *Decatur School District*, 31 Ill. 2d 612; *People ex rel. Goelzer v. Crawford*, 310 Ill. 205 (1923) (finding district invalid under both the constitution and the applicable statute).

The framers of the 1970 Constitution embraced this limited construction that the constitutional efficiency requirement authorized judicial review of school district boundaries, but they did not intend to otherwise limit legislative discretion. The education committee's report accompanying the proposed education article specifically states, "The concept of the efficiency of the system (already contained in the present Constitution) has been used by the courts as a guide to the validation of district boundary changes. The Committee believes it useful to continue this concept and to add the notion of high quality." 6 Proceedings 234.

An exchange between Delegates Netsch and Patch during the debate on section 1 confirms the framers' understanding of the efficiency concept:

"MRS. NETSCH: Mr. Patch or Mr. Fogal, could I explore just very briefly your use of the word \*\*\* 'efficient' \*\*\*. Was this done quite consciously to adopt and reincorporate into this constitutional provision all of the body of law that has developed with respect to that term in the previous constitution?

MR. PATCH: Yes. In terms of boundaries and in terms of quality, so there would be a continuity of education based on the law or the court decisions relative to efficiency." 2 Proceedings 766.

Careful review of the remainder of the debates on section 1 of the education article and other relevant materials in the convention record discloses no persuasive evidence to support the view that section 1's efficiency requirement was intended by the framers to function more broadly as a substantive guarantee of parity in educational opportunity or funding. Accord ILCS Ann., 1970 Const., art. X, § 1, Constitutional Commentary, at 789 (Smith-Hurd 1993) ("There is no indication that the Convention intended to alter the line of cases in which the courts have deferred to the legislature on the meaning of terms such as 'efficient' ").

Disparity in educational funding was a highly charged and controversial subject during the constitutional convention, but it was not touched upon to any significant degree in connection with section 1's efficiency requirement. Instead, the debate over unequal opportunities and resources ultimately led to the incorporation of section 1's final sentence, which provides that "[t]he State has the primary responsibility for financing the system of public education." Ill. Const. 1970, art. X, § 1. That language did not appear in the education committee's originally proposed education article. Rather, by a six to five majority, the education committee had initially proposed a separate section

governing school finance that was designed to achieve greater parity of educational funding and opportunity by limiting local contributions to school operational costs to 10% of the amount received from the General Assembly. See 6 Proceedings 295. Delegate Bottino, a member of the education committee, submitted an alternative proposal permitting funding from local taxation in an amount equal to state funding, and requiring that state funds be distributed so as to "provide for substantial parity of educational opportunity throughout the state." 1 Proceedings 622-23.

The members of the education committee were deeply divided over the main committee proposal. The committee's majority report specifically noted that "[a] salient fact of Illinois school finance is the enormous inequality among the districts with respect to their resources from local tax receipts" and that "the quality of education received by any student in the State is largely a product of the accident of the wealth of his district." 6 Proceedings 297. One of the majority's stated objectives was to "produce a level of educational opportunity that would be more equal throughout the State for all children." 6 Proceedings 299. The education committee's minority report acknowledged existing inequities in school funding (see 6 Proceedings 300), but sought to preserve the tradition of local control of public education, which the minority feared would be imperiled under a constitutional regime of centralized funding of education. The minority believed that a system of statewide funding of schools would prove incompatible with local autonomy in educational decisionmaking. Simply put, the minority did not believe that it was realistic to expect that the General Assembly would allow local school boards and administrators free rein with state funds. See 6 Proceedings 301-02. The minority also objected that:

"While substantially full [State] support might improve the programs of inferior schools, it would lower the quality of education in the better schools and make it impossible for local citizens to restore these quality programs despite their willingness to do so. Local citizens might well show less interest in the welfare of their schools if they are frustrated in their efforts to improve their programs." 6 Proceedings 302.

The minority further expressed the view that educational funding was "inherently a legislative subject." 6 Proceedings 304.

The framers of the 1970 Constitution rejected both the education committee proposal (1 Proceedings 527-28) and Delegate Bottino's alternative proposal (1 Proceedings 622-23). Subsequently, however, Delegate Netsch offered an amendment to section 1 adding the language placing primary responsibility for financing public education on the state. 1 Proceedings 738. Delegate Netsch explained that the purpose of the amendment was "to put the Convention on record" that the state should bear greater responsibility for school funding both to reduce the burden of property taxes and to cure inequality in education. 5 Proceedings 4502. Delegate Netsch carefully explained, however, that the added language was "not a legally obligatory command to the state legislature. *** [I]t is something that can be pointed to every time the question of appropriations from the state to the school districts is at issue." 5 Proceedings 4502. In *Blase v. State*, 55 Ill. 2d 94 (1973), this court reviewed this background and held that the final sentence of section 1 "was intended only to express a goal or objective, and not to state a specific command." *Blase*, 55 Ill. 2d at 98; see also *People ex rel. Carey v. Board of Education*, 55 Ill. 2d 533, 535 (1973).

In our view, the foregoing persuasively suggests that the framers of the 1970 Constitution viewed educational equality and "efficiency" to be separate and distinct

subjects. The framers of the 1970 Constitution grappled with the issue of unequal educational funding and opportunity, and chose to address the problem with a purely hortatory statement of principle. To ignore this careful and deliberate choice by interpreting the efficiency requirement as an enforceable guarantee of equality would do violence to the framers' understanding of the education article.

Plaintiffs insist that the rejection of the specific funding proposals merely represents the framers' unwillingness to prescribe specific funding ratios or formulas in the constitution. According to plaintiffs, the delegates generally spoke in support of the general ideal of equalizing educational opportunity. Be that as it may, we find no significant evidence in the convention record suggesting that the delegates believed that section 1's efficiency requirement related to these concerns.[3] The mere utterance of sentiments favoring educational equality does not itself give rise to a constitutional guarantee. This court has noted:

> "While statements and reports made by the delegates to the constitutional convention are certainly useful and important aids in *interpreting* ambiguous language of the constitution [citation], they are, of course, not a part of the constitution. It would be improper for this court to transform statements made during the constitutional convention into constitutional requirements where such statements are not reflected in the language of the consti-

---

[3]Some delegates predicted that educational funding disparities arising from differences in local taxable property wealth might ultimately be held to violate the equal protection clause of the fourteenth amendment to the United States Constitution. See 4 Proceedings 3539 (statement of Delegate Howard); 4 Proceedings 3569 (statement of Delegate Weisberg). As will be seen, that did not occur. See *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973).

tution." (Emphasis in original.) *Village of Carpentersville v. Pollution Control Board*, 135 Ill. 2d 463, 473 (1990).

Reminding us that the meaning of a constitutional provision depends on the common understanding of the citizens who ratified the constitution, plaintiffs emphasize that with reference to the education article, the "Address to the People" accompanying the 1970 Constitution upon its submission to the voters explains that "[t]he Convention was greatly concerned with improving and equalizing opportunities for education." 7 Proceedings 2676. The articulated "concern" is manifest in the purely hortatory features of the education article as described above and in *Blase v. State*, 55 Ill. 2d 94 (1973). The mere expression of concern does not describe an enforceable constitutional guarantee of educational equality.

Finally, plaintiffs contend that several decisions from other states interpreting similar constitutional language have concluded that "efficiency" dictates fairness and parity in educational funding. See *Abbott v. Burke*, 119 N.J. 287, 575 A.2d 359 (1990); *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186 (Ky. 1989); *Edgewood Independent School District v. Kirby*, 777 S.W.2d 391 (Tex. 1989); *Pauley v. Kelly*, 162 W. Va. 672, 255 S.E.2d 859 (1979). For various reasons, these decisions provide no persuasive support for plaintiffs' argument.

*Pauley* simply does not stand for the proposition for which plaintiffs cite it. In *Pauley*, the court ultimately defined a "thorough and efficient" system of schools not in terms of equal opportunity, but in terms of various specific substantive educational goals. *Pauley*, 162 W. Va. at 699-700, 255 S.E.2d at 877. Similarly, in *Abbott*, the court stated that New Jersey's "thorough and efficient" clause required "a certain level of educational opportunity, a minimum level, that will equip the student to become 'a citizen and ... a competitor in the

labor market.' [Citation.] *** If, however, that level is reached, the constitutional mandate is fully satisfied regardless of the fact that some districts may exceed it." *Abbott*, 119 N.J. at 306, 575 A.2d at 369. Indeed, the *Abbott* court noted that in an earlier decision the school finance statute was upheld as facially valid even though it guaranteed the continuation of substantial disparities in educational expenditures per pupil. *Abbott*, 119 N.J. at 308, 575 A.2d at 369, citing *Robinson v. Cahill*, 69 N.J. 449, 355 A.2d 129 (1976).

Despite these statements, the *Abbott* court concluded that New Jersey was constitutionally required to ensure that education in poor urban school districts was funded at substantially the same level as in more affluent suburban districts. *Abbott*, 119 N.J. at 385, 575 A.2d at 408. The court reached this dubious result essentially by equating the constitutionally guaranteed minimum level of educational opportunity with the educational offerings in the wealthiest districts. See *Abbott*, 119 N.J. at 364, 575 A.2d at 397; see also Note, *State Constitutional Law—Public School Financing—Spending Disparity Between Wealthy School Districts and Poor Urban School Districts, Caused By Reliance on Local Property Taxes, is Violative of the "Thorough and Efficient Education" Clause*, 21 Seton Hall L. Rev. 445, 470 (1991). One writer has characterized the reasoning employed in *Abbott* as "an intellectual shell game" (21 Seton Hall L. Rev. at 477-78), and has suggested that the variance between the court's description of the "thorough and efficient" requirement and its ultimate holding "is simply the imprimatur of result oriented jurisprudence cloaked in superfluous reasoning" (21 Seton Hall L. Rev. at 480). The criticism is well founded, and we therefore decline to apply the *Abbott* court's analysis in this case.

The other decisions cited by plaintiffs, *Rose* from Kentucky and *Kirby* from Texas, are of limited relevance

because in each case the construction given the term "efficient" depended in large measure on historical conditions and considerations (see *Rose*, 790 S.W.2d at 205-06; *Kirby*, 777 S.W.2d at 395-96) which are not part of the history of our own constitution. While plaintiffs place major emphasis on *Kirby*, the historical basis for the court's analysis stands in sharp contrast to the history of our constitution. In *Kirby*, the court noted that in 1876, when the Texas constitution was written, economic conditions and educational funding were fairly uniform throughout the state, and the framers never contemplated the gross funding disparities that were later to develop as wealth grew at different rates in different districts. *Kirby*, 777 S.W.2d at 395-96. In contrast, as discussed above, the framers of the Illinois Constitution of 1970 were well aware of disparities produced under the local property tax based funding system. Indeed, inequality was a recognized feature of education in Illinois when the 1870 Constitution—which introduced the efficiency concept in Illinois—was adopted. As stated in *Richards v. Raymond*, 92 Ill. 612, 617-18 (1879):

> "[I]t is a part of the history of the State when the constitution was framed, that there was a great want of uniformity in the course of study prescribed and taught in the common schools of the State. In the larger and more wealthy counties the free schools were well graded and the course of instruction of a high order, while in the thinly settled and poorer counties the old district system was still retained and the course of instruction prescribed was of a lower order."

In view of all of the foregoing considerations, we agree with the courts below that disparities in educational funding resulting from differences in local property wealth do not offend section 1's efficiency requirement.

## B

The remaining question under section 1 of the educa-

tion article pertains to its guarantee of a system of "high quality" educational institutions and services. There is no dispute as to the nature of this guarantee in the abstract. Instead, the central issue is whether the quality of education is capable of or properly subject to measurement by the courts. Plaintiffs maintain that it is the courts' duty to construe the constitution and determine whether school funding legislation conforms with its requirements and cite a number of decisions from other jurisdictions in which courts have concluded that similar constitutional challenges are capable of judicial resolution. As explained below, however, we conclude that questions relating to the quality of education are solely for the legislative branch to answer.

Historically, this court has assumed only an exceedingly limited role in matters relating to public education, recognizing that educational policy is almost exclusively within the province of the legislative branch. Section 1 of article VIII of the 1870 Constitution provided that "[t]he general assembly shall provide a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education." Ill. Const. 1870, art. VIII, § 1. As discussed earlier, except in matters relating to school district boundaries, this court consistently held that questions relating to the efficiency and thoroughness of the school system were left to the wisdom of the legislative branch. This principle has likewise been applied with respect to the efficiency requirement in the 1970 Constitution. See *Cronin v. Lindberg*, 66 Ill. 2d 47, 58 (1976) (law reducing state aid to schools that failed to operate for a school year of a specified minimum duration was not reviewable under the efficiency requirement).

More generally, it has been stated that section 1 of article VIII of the 1870 Constitution was both "a

mandate to the legislature and a limitation on the exercise of the [legislative] power. [Citation.] The mandate is to provide a thorough and efficient system of schools, and the limitations are that they shall be free to all children of the State and such that all children may receive a good common school education." *People ex rel. Leighty v. Young*, 309 Ill. 27, 33 (1923); see also *People ex rel. Hepfer v. Price*, 310 Ill. 66, 73 (1923). Yet, while the requirement that schools provide a "good common school education" was explicitly recognized to be a limitation on the legislature's power to enact public school laws, that limitation was not among those held generally capable of *judicial* enforcement. *Fiedler v. Eckfeldt*, 335 Ill. 11 (1929), illustrates this subtle but important point:

"[Section 1 of article VIII of the 1870 Constitution] was a command addressed to the legislature, and it has been construed as a limitation also on its power to provide for the maintenance by local taxation of free schools of a different character from that named in the section. *** When we look for the limitations on that power we find these two, and these two only, *which the courts can enforce*: that the schools shall be free, and that they shall be open to all equally. The court has enforced these limitations when the occasion requiring the enforcement of them arose. [Citations.] There are no others *to which the judicial power extends*." (Emphasis added.) *Fiedler*, 335 Ill. at 23.

In *Richards v. Raymond*, 92 Ill. 612 (1879), this court rejected the claim that a law providing for the establishment of public high schools exceeded the General Assembly's power to provide for schools where children may receive "a good common school education." This court found no basis in the 1870 Constitution for limiting the discretion of the legislature in determining what a good common school education entails:

"No definition of a common school is given or specified in the constitution, nor does that instrument declare what

course of studies shall constitute a common school education. How can it be said that a high school is prohibited by the constitution and not included within the definition of a common school? The phrase, 'a common school education' is one not easily defined. One might say that a student instructed in reading, writing, geography, English grammar and arithmetic had received a common school education, while another who had more enlarged notions on the subject might insist that history, natural philosophy and algebra should be included. It would thus be almost impossible to find two persons who would in all respects agree in regard to what constituted a common school education.

\*\*\*

\*\*\* [W]hile the constitution has not defined what a good common school education is, and has failed to prescribe a limit, it is no part of the duty of the courts of the State to declare by judicial construction what particular branches of study shall constitute a common school education. That may be and doubtless is a proper question for the determination of the legislature, and as a law has been enacted by it which does not appear to violate the constitution it is not the province of the courts to interfere." *Richards*, 92 Ill. at 617-18.

Notwithstanding this jurisprudence, plaintiffs insist that our present constitution accommodates a more active judicial role in implementing the constitutional guarantee of an efficient system of high quality educational institutions and services. In this regard, plaintiffs stress that while the 1870 Constitution specified that the *General Assembly* shall provide a system of public schools, the 1970 Constitution expressly places that duty on *the State*. In plaintiffs' view, the change in language signifies that section 1 of the education article is no longer merely a mandate to the General Assembly, but is a mandate to *all three* branches of the state government: the executive branch, the legislative branch and the judicial branch. Surely, however, this provision does not alter the roles or expand the powers assigned to the dif-

ferent branches of government by the constitution. Courts may not legislate in the field of public education any more than they may legislate in any other area. In reviewing legislation, the role of the courts is now, as before, to ensure that the enactment does not exceed whatever *judicially enforceable* limitations the constitution places on the General Assembly's power. Courts are no more capable of defining "high quality educational institutions and services" under our present constitution than they were able to define a "good common school education" under the 1870 Constitution. As the following exchange during the constitutional convention shows, the framers of the 1970 Constitution did not intend to formulate any specific definition of "high quality," nor did they anticipate that the concept would be defined by the courts:

> "MR. GARRISON: ***
>
> It is my understanding that the word 'quality' is—in relation to education—is a much debated concept and that there have been commissions which have given a great deal of study to it.
>
> Did the [education] committee come to any definite definition or conclusion as to what would constitute quality services with respect to education?
> ***
> MR. FOGAL: No, we—the word 'quality,' I suppose, means different things to different people. We had in mind the highest, the most excellent educational system possible; leave this up to the determination of the legislature and your local districts, and let the citizens keep pushing for higher-quality education. We didn't attempt to define all of the ramifications of high quality." 2 Proceedings 767.

Delegate Kamin, a member of the education committee, added that "[t]he use of the word 'high quality' is a play on the use of the word 'good' which is in the present article." 2 Proceedings 767. According to delegate Kamin the education committee felt that "there was not

any more specific a definition perhaps for 'high quality' than there was for 'good,' but at least 'good' is a lower term; 'high quality' is a term which is going in the direction in which we want to go." 2 Proceedings 767.

Our constitutional jurisprudence in the field of public education has been guided by considerations of separation of powers. In federal courts, the principles of separation of powers find expression in the so-called "political question" doctrine. See *Baker v. Carr*, 369 U.S. 186, 210, 7 L. Ed. 2d 663, 682, 82 S. Ct. 691, 706 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers"). The United States Supreme Court has stated that, " '[i]n determining whether a question falls within [the political question] category, the appropriateness under our system of government of attributing finality to the action of the political departments *and also the lack of satisfactory criteria for a judicial determination* are dominant considerations.' " (Emphasis added.) *Baker*, 369 U.S. at 210, 7 L. Ed. 2d at 682, 82 S. Ct. at 706, quoting *Coleman v. Miller*, 307 U.S. 433, 454-55, 83 L. Ed. 1385, 1397, 59 S. Ct. 972, 982 (1939).

In *Baker*, the Court identified several characteristics of nonjusticiable political questions, including "a lack of judicially discoverable and manageable standards for resolving [the question] or the impossibility of deciding [it] without an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217, 7 L. Ed. 2d at 686, 82 S. Ct. at 710. What constitutes a "high quality" education, and how it may best be provided, cannot be ascertained by any judicially discoverable or manageable standards. The constitution provides no principled basis for a judicial definition of high quality. It would be a transparent conceit to suggest that whatever standards of quality courts might develop would actually be derived from the constitution

in any meaningful sense. Nor is education a subject within the judiciary's field of expertise, such that a judicial role in giving content to the education guarantee might be warranted. Rather, the question of educational quality is inherently one of policy involving philosophical and practical considerations that call for the exercise of legislative and administrative discretion.

To hold that the question of educational quality is subject to judicial determination would largely deprive the members of the general public of a voice in a matter which is close to the hearts of all individuals in Illinois. Judicial determination of the type of education children should receive and how it can best be provided would depend on the opinions of whatever expert witnesses the litigants might call to testify and whatever other evidence they might choose to present. Members of the general public, however, would be obliged to listen in respectful silence. We certainly do not mean to trivialize the views of educators, school administrators and others who have studied the problems which public schools confront. But nonexperts—students, parents, employers and others—also have important views and experiences to contribute which are not easily reckoned through formal judicial factfinding. In contrast, an open and robust public debate is the lifeblood of the political process in our system of representative democracy. Solutions to problems of educational quality should emerge from a spirited dialogue between the people of the state and their elected representatives. In delegate Fogal's words, previously quoted, "let the citizens keep pushing for higher-quality education." 2 Proceedings 767.

We are well aware that courts in other jurisdictions have seen fit to define the contours of a constitutionally guaranteed education and to establish judicial standards of educational quality reflecting varying degrees of specificity and deference to the other branches of

government. See, *e.g.*, *Campbell County School District v. State*, 907 P.2d 1238, 1265 (Wyo. 1995); *Campaign for Fiscal Equity, Inc. v. State*, 86 N.Y. 2d 307, 317-19, 655 N.E.2d 661, 666-76, 631 N.Y.S.2d 565, 570-71 (1995); *Claremont School District v. Governor*, 138 N.H. 183, 192, 635 A.2d 1375, 1381 (1993); *McDuffy v. Secretary of the Executive Office of Education*, 415 Mass. 545, 606, 615 N.E.2d 516, 548 (1993); *Tennessee Small School Systems v. McWherter*, 851 S.W.2d 139, 147-48. (Tenn. 1993) (*dicta*); *Abbott v. Burke*, 119 N.J. 287, 303-04, 575 A.2d 359, 367 (1990); *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 208-09 (Ky. 1989); *Pauley v. Kelly*, 162 W. Va. 672, 705-06, 255 S.E.2d 859, 874 (1979); *Seattle School District No. 1 v. State*, 90 Wash. 2d 476, 502, 585 P.2d 71, 86-87 (1978); see also *Idaho Schools for Equal Educational Opportunity v. Evans*, 123 Idaho 573, 583-84, 850 P.2d 724, 734 (1993) (holding that it was court's duty to interpret constitutional "thoroughness" requirement, but adopting standards promulgated by the executive branch); *Unified School District No. 229 v. State*, 256 Kan. 232, 275, 885 P.2d 1170, 1186 (1994) (court would not substitute its judgment as to what type of education was "suitable" within the meaning of the constitution for the standards developed by the legislature and state department of education; where all schools were able to meet those standards, the school finance statute was upheld); *McDaniel v. Thomas*, 248 Ga. 632, 633, 643-44, 285 S.E.2d 156, 157, 165 (1981) (while holding that the question of whether financing system deprived children of constitutionally guaranteed "adequate education" was justiciable, court would only inquire whether system met a lower standard of providing a minimum or basic education; because of the inherent difficulty in establishing a judicially manageable standard for determining whether or not pupils are being provided an "adequate education," legislative branch

must give content to the term "adequate"). By and large these courts have viewed the process of formulating educational standards as merely an exercise in constitutional interpretation or construction. For the reasons already stated, we disagree; we will not "under the guise of constitutional interpretation, presume to lay down guidelines or ultimatums for [the legislature]." *Seattle School District*, 90 Wash. 2d at 579, 585 P.2d at 128 (Rosellini, J., dissenting, joined by Hamilton & Hicks, JJ.).

Rather, we agree with the views of the dissenters in several of the cases cited above. In *Seattle School District*, Justice Rosellini lamented the court's usurpation of the legislative prerogative in the area of educational policy:

"I would be surprised to learn that the people of this state are willing to turn over to a tribunal against which they have little if any recourse, a matter of such grave concern to them and upon which they hold so many strong, though conflicting views. If their legislators pass laws with which they disagree or refuse to act when the people think they should, they can make their dissatisfaction known at the polls. They can write to their representatives or appear before them and let their protests be heard. The court, however, is not so easy to reach [citation] nor is it so easy to persuade that its judgment ought to be revised. A legislature may be a hard horse to harness, but it is not quite the stubborn mule that a court can be. Most importantly, the court is not designed or equipped to make public policy decisions, as this case so forcibly demonstrates." *Seattle School District*, 90 Wash. 2d at 563-64, 585 P.2d at 120 (Rosellini, J., dissenting, joined by Hamilton & Hicks, JJ.).

In *Pauley*, Justice Neely offered the following views regarding West Virginia's "thorough and efficient system" requirement which are germane to our own constitution's efficiency and quality guarantees:

" 'Thorough and efficient' education apparently does not mean in this modern world just advanced mathemat-

ics, chemistry, physics, foreign languages, competence in written and spoken English, and a well-developed knowledge of history. Something more in the form of vocational training and preparation for life is implied, yet whatever it is, it is far too unmanageable a standard to be developed in a vacuum devoid of political give and take by the logical judicial mind, because inherent in any consensus about 'thorough and efficient' education is a difficult balance between irreconcilable value systems. I have my own ideas of what constitutes 'thorough and efficient' education; nonetheless, I am constitutionally constrained not to force them down the throats of other equally well-informed persons who have different values merely because I am a judge." *Pauley*, 162 W. Va. at 747, 255 S.E.2d at 899 (Neely, J., dissenting).

We conclude that the question of whether the educational institutions and services in Illinois are "high quality" is outside the sphere of the judicial function. To the extent plaintiffs' claim that the system for financing public schools is unconstitutional rests on perceived deficiencies in the quality of education in public schools, the claim was properly dismissed. For the foregoing reasons, we affirm the dismissal of plaintiffs' claims under the education article of our state constitution.

## II

We next consider whether the alleged disparities in educational funding and opportunity due to variations in local property wealth give rise to a cause of action under the equal protection clause of our state constitution (Ill. Const. 1970, art. I, § 2). This court has recently offered the following description of the analytical framework for evaluating equal protection claims:

"The analysis applied by this court in assessing equal protection claims is the same under both the United States and Illinois Constitutions. [Citation.] The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner. [Cita-

tion.] It does not preclude the State from enacting legislation that draws distinctions between different categories of people, but it does prohibit the government from according different treatment to persons who have been placed by statute into different classes on the basis of criteria wholly unrelated to the purpose of the legislation. [Citation.]

In reviewing a claim that a statute violates equal protection, the court applies different levels of scrutiny depending on the nature of the statutory classification involved. Classifications based on race or national origin or affecting fundamental rights are strictly scrutinized. Intermediate scrutiny applies to discriminatory classifications based on sex or illegitimacy. In all other cases, the court employs only a rational basis review." *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 322-23 (1996).

Because the present challenge to the school funding scheme does not involve a classification based on gender or illegitimacy, the intermediate level of scrutiny does not apply. Accord *Board of Education, Levittown Union Free School District v. Nyquist*, 57 N.Y.2d 27, 42-43, 439 N.E.2d 359, 365-66, 453 N.Y.S.2d 643, 649-50 (1982). Moreover, plaintiffs do not argue that the school funding scheme involves a suspect classification such as race or national origin. Thus, the applicable standard of review in this case depends on whether education is a fundamental right. If so, to the extent that funding disparities can be said to impinge on or interfere with the right to an education, the system for financing public schools would be subject to strict scrutiny. On the other hand, if education is not a fundamental right, the highly deferential "rational basis" test would apply.

In *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 36 L. Ed. 2d 16, 93 S. Ct. 1278 (1973), the United States Supreme Court rejected a challenge under the equal protection clause of the United States Constitution (U.S. Const., amend. XIV) to Texas' system

of financing public schools. As in the case at bar, the challenge in *Rodriguez* was based upon funding disparities due to variations in local wealth. The Court determined that education was not a fundamental right for equal protection purposes under the United States Constitution, and hence Texas' school funding scheme was not subject to strict scrutiny. The Court reasoned that the key to determining whether education is fundamental "lies in assessing whether there is a right to education explicitly or implicitly guaranteed by the Constitution." *Rodriguez*, 411 U.S. at 33, 36 L. Ed. 2d at 43, 93 S. Ct. at 1297. The Court observed that education was not explicitly afforded constitutional protection, and the Court could find no basis for saying it was implicitly so protected. *Rodriguez*, 411 U.S. at 35, 36 L. Ed. 2d at 44, 93 S. Ct. at 1297.

Plaintiffs argue that *Rodriguez* does not control the determination of whether education is a fundamental right under our state constitution. They contend that unlike the United States Constitution, section 1 of the education article of our state constitution explicitly guarantees the right to an education. While our constitution does not expressly speak of a "right" to education, it may be argued that such a right corresponds to the constitutional requirement that "[t]he State *shall* provide for an efficient system of high quality public educational institutions and services" (emphasis added) (Ill. Const. 1970, art. X, § 1). See *Seattle School District No. 1 of King County v. State*, 90 Wash. 2d 476, 495, 585 P.2d 71, 91 (1978); but see *Idaho Schools for Equal Educational Opportunity v. Evans*, 123 Idaho 573, 581-82, 850 P.2d 724, 732-33 (1993) ("Although the sections of our state constitution which impose a duty upon the government might be said to invest a derivative right in those to whom the duty is owed, the inclusion of those derivative rights in our definition of fundamental rights

would be overly broad"). In any event, this court has specifically indicated that not every right secured by our state constitution is "fundamental." *Kalodimos v. Village of Morton Grove,* 103 Ill. 2d 483, 509 (1984); accord *Illinois Pure Water Committee, Inc., v. Director of Public Health*, 104 Ill. 2d 243, 251-52 (1984) (noting absence of authority that sections 1 and 2 of article XI of the 1970 Constitution create a "fundamental" right to a healthful environment, and declining to subject statutes affecting the environment to heightened scrutiny). This view is consistent with decisions from other jurisdictions which have observed that while the federal government is one of limited or delegated powers, all powers not delegated to the United States or prohibited to the states are reserved to the states or to the people. As such, state constitutions touch upon a range of subjects, not all of which are fundamental. See *Hornbeck v. Somerset County Board of Education,* 295 Md. 597, 642, 458 A.2d 758, 785 (1983) (and cases cited); *Fair School Finance Council of Oklahoma, Inc. v. State,* 746 P.2d 1135, 1148-49 (Okla. 1987).

This court has stated that fundamental rights are "only those which 'lie at the heart of the relationship between the individual and a republican form of nationally integrated government.'" *Kalodimos,* 103 Ill. 2d at 509, quoting *People ex rel. Tucker v. Kotsos,* 68 Ill. 2d 88, 97 (1977). Fundamental rights include the expression of ideas, participation in the political process, travel among the states and privacy with regard to the most intimate and personal aspects of one's life. *Kotsos,* 68 Ill. 2d at 97. Plaintiffs urge us to add education to this list because of its relationship with certain of these rights which are at the core of one's role as a citizen. Plaintiffs contend that an education is essential to one's ability to lead a productive life and is closely tied to the basic rights of democracy. *Amici* amplify the point, asserting that "[a]

sound education \*\*\* provides meaning and substance to other fundamental rights—including the right to speak, the right to enjoy an occupation of choice and the right to vote."

While plaintiffs and *amici* perceptively characterize the relationship between education and certain basic aspects of citizenship, we disagree with their conclusion that this relationship justifies treating education as *itself* a fundamental right for equal protection purposes. Generally speaking, the fundamental right analysis is concerned with laws that somehow *restrain* the exercise of a fundamental right. See *Rodriguez*, 411 U.S. at 38, 36 L. Ed. 2d at 46, 93 S. Ct. at 1299 ("Each of our prior cases involved legislation which 'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental personal right or liberty"). Recognition that rights of expression and participation in the political process are fundamental—and thus safeguarded against unjustified governmental interference—does not necessarily translate into an affirmative governmental obligation to enrich each individual's personal capacity or ability to exercise these rights. In this regard it is significant that while the framers of the 1970 Constitution recognized the importance of "the educational development of all persons to the limits of their capacities," they stopped short of declaring such educational development to be a "right," choosing instead to identify it as a "fundamental *goal*." (Emphasis added.)

In determining that education was not implicitly protected by the United States Constitution, the *Rodriguez* Court rejected an argument similar to the one plaintiffs and *amici* presently advance:

"The Court has long afforded zealous protection against unjustifiable governmental interference with the individual's rights to speak and to vote. Yet we have never presumed to possess either the ability or the authority to guarantee to the citizenry the most *effective* speech or the

most *informed* electoral choice. That these may be desirable goals of a system of freedom of expression and of a representative form of government is not to be doubted. These are indeed goals to be pursued by a people whose thoughts and beliefs are freed from governmental interference. But they are not values to be implemented by judicial intrusion into otherwise legitimate state activities." (Emphasis in original.) *Rodriguez*, 411 U.S. at 36, 36 L. Ed. 2d at 44-45, 93 S. Ct. at 1298.

While education is certainly a vitally important governmental function (see *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 73-74 (1990)), it is not a fundamental individual right for equal protection purposes, and thus the appropriate standard of review is the rational basis test. Under the rational basis test, judicial review of a legislative classification is limited and generally deferential. *Jacobson v. Department of Public Aid*, 171 Ill. 2d 314, 323 (1996). The challenged classification need only be rationally related to a legitimate state goal (*People v. Bailey*, 167 Ill. 2d 210, 231 (1995)) and if any state of facts can reasonably be conceived to justify the classification, it must be upheld (*Jacobson*, 171 Ill. 2d at 324).

The rationality of Illinois' school funding scheme is best gauged in light of the basic philosophical considerations that have defined the policy debate in the area of public education finance. As noted in *Rodriguez*:

" 'The history of education since the industrial revolution shows a continual struggle between two forces: the desire by members of society to have educational opportunity for all children, and the desire of each family to provide the best education it can afford for its own children.' " *Rodriguez*, 411 U.S. at 49, 36 L. Ed. 2d at 52, 93 S. Ct. at 1305, quoting J. Coleman, Foreword to G. Strayer & R. Haig, The Financing of Education in the State of New York vii (1923).

Similarly, one commentator has observed:

"The character of a public education system can be evaluated in terms of three often competing principles: quality,

equality, and liberty. The quality of a school system is high when good educational opportunities are available to the least advantaged children in the state. In a school system featuring a high degree of equality every student has access to the same educational resources as any other student. Liberty is enhanced when localities or families have the autonomy to determine what proportion of their resources they wish to devote to the education of their youth.

*** A guarantee of equal educational funding does not secure any particular level of quality. It does ensure a high level of equality and a low level of liberty. Liberty is curtailed because equalization of educational funding requires redistribution of resources from wealthy districts to poor ones, which can only be achieved through greater centralization of control over the public schools. Centralization reduces the freedom of localities and families to choose their own levels of educational spending." R. Stark, *Education Reform: Judicial Interpretation of State Constitutions' Education Finance Provisions—Adequacy vs. Equality*, 1991 Annual Survey of American Law 609, 665-66.

The concept of "local control" in public education connotes not only the opportunity for local participation in decisionmaking but also "the freedom to devote more money to the education of one's children." *Rodriguez*, 411 U.S. at 49-50, 36 L. Ed. 2d at 52, 93 S. Ct. at 1304-05; see also *Lujan v. Colorado State Board of Education*, 649 P.2d 1005, 1023 (Colo. 1982) ("[local] control is exercised by influencing the determination of how much money should be raised for local schools, and how that money should be spent"). As noted earlier, several members of the education committee of the Sixth Constitutional Convention voiced strong support for the preservation of local control. They felt that community members would be less enthusiastic in their efforts to improve public education if limits were placed on community decisions to support local schools with local resources for the sake of equalizing resources statewide.

The general structure of the state's system of funding public schools through state and local resources—and the particular amounts allocated for distribution as general state aid—represent legislative efforts to strike a balance between the competing considerations of educational equality and local control. Certainly reasonable people might differ as to which consideration should be dominant. However, the highly deferential rational basis test does not permit us to substitute our judgment in this regard for that of the General Assembly, and we have no basis to conclude that the manner in which the General Assembly has struck the balance between equality and local control is so irrational as to offend the guarantee of equal protection. We also note that although reliance on local wealth to fund public education produces variations in resources which do not necessarily correspond to differences in educational needs, the same may be said for a variety of important governmental services, such as police and fire protection, which have traditionally been funded at the local level. See *Rodriguez*, 411 U.S. at 53-54, 36 L. Ed. 2d at 54-55, 93 S. Ct. at 1307. Consequently, the logical implications of declaring Illinois' system of financing public education to be "irrational" might be far reaching indeed. While the present school funding scheme might be thought unwise, undesirable or unenlightened from the standpoint of contemporary notions of social justice, these objections must be presented to the General Assembly.

While some decisions in other jurisdictions have concluded that there is no rational basis for funding disparities based on local wealth (see, *e.g.*, *Tennessee Small School Systems v. McWherter*, 851 S.W.2d 139, 153-56 (Tenn. 1993); *Dupree v. Alma School District No. 30*, 279 Ark. 340, 345, 651 S.W.2d 90, 93 (1983)), financing schemes similar to ours have been upheld by a ma-

jority of those courts that have applied the rational basis standard (see, *e.g.*, *City of Pawtucket v. Sundlun*, 662 A.2d 40, 62 (R.I. 1995); *Kukor v. Grover*, 148 Wis. 2d 469, 497-510, 436 N.W.2d 568, 580-85 (1989); *Fair School Finance Council of Oklahoma, Inc. v. State*, 746 P.2d 1135, 1150 (Okla. 1987); *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 651, 458 A.2d 758, 788-90 (1983); *Board of Education, Levittown Union Free School District v. Nyquist*, 57 N.Y. 2d 27, 43-46, 439 N.E.2d 359, 366-68, 453 N.Y.S.2d 643, 650-52 (1982); *Lujan v. Colorado State Board of Education*, 649 P.2d 1005, 1022-23 (Colo. 1982); *McDaniel v. Thomas*, 248 Ga. 632, 648, 285 S.E.2d 156, 167-68 (1981); *Board of Education v. Walter*, 58 Ohio St. 2d 368, 377, 390 N.E.2d 813, 820 (1979); *Thompson v. Engelking*, 537 P.2d 635, 645 (Idaho 1975)). In accordance with *Rodriguez* and the majority of state court decisions, and for all the reasons set forth above, we conclude that the state's system of funding public education is rationally related to the legitimate state goal of promoting local control. Plaintiffs' claims under the equal protection clause of the Illinois Constitution were properly dismissed.

## CONCLUSION

In closing, it bears emphasis that our decision in no way represents an endorsement of the present system of financing public schools in Illinois, nor do we mean to discourage plaintiffs' efforts to reform the system. However, for the reasons explained above, the process of reform must be undertaken in a legislative forum rather than in the courts. Plaintiffs' complaint was properly dismissed, and we therefore affirm the judgment of the appellate court.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

JUSTICE FREEMAN, concurring in part and dissenting in part:

I agree with the majority that count I of plaintiffs' complaint does not state a cause of action under the equal protection clause of the 1970 Illinois Constitution (Ill. Const. 1970, art. I, § 2). Accordingly, I concur in that part of the majority opinion that upholds the trial court's dismissal of that count. 174 Ill. 2d at 32-40.

However, the majority also concludes that count III of the complaint does not state a cause of action under the education article of the 1970 Illinois Constitution (Ill. Const. 1970, art. X, § 1). I respectfully disagree. I conclude that count III does state a cause of action under the education article. Accordingly, I dissent from that part of the majority opinion that upholds the trial court's dismissal of that count. 174 Ill. 2d at 10-32.

## BACKGROUND

This case comes to this court on a motion to dismiss. 735 ILCS 5/2—615 (West 1994). Therefore, we must determine whether plaintiffs' second-amended complaint, when viewed in the light most favorable to plaintiffs, alleges sufficient facts to establish a cause of action on which relief may be granted. We must take as true all well-pled facts in the complaint and construe all reasonable inferences in favor of plaintiffs. See *Ziemba v. Mierzwa*, 142 Ill. 2d 42, 46-47 (1991); *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 473 (1990).

The majority describes the gist of plaintiffs' detailed second-amended complaint. 174 Ill. 2d at 8-10. Plaintiffs allege the following. The Illinois public school funding scheme creates vast disparities in educational resources and opportunity among Illinois school districts. The complaint quotes from the 1989 School Report Card, published by the Illinois State Board of Education, which stated as follows. Rich school districts employed a greater percentage of teachers with advanced degrees

than poor districts. Rich school districts paid their teachers considerably higher salaries than poor districts. Also, more money was spent to educate students in rich school districts than in poor districts. In contrast, poor school districts, with significantly higher proportions of students from low-income families, had considerably fewer resources to help educate their children than rich districts.

I recount some of the complaint's specific allegations to show clearly the factual basis of this lawsuit. For example, a poor school district reported that "it replaces its worn-out desks by retrieving from a dumpster perfectly functional desks thrown away by a neighboring school district."

The complaint offers two neighboring school districts as "a concrete example of the consequences of differences in local property wealth." Byron Community Unit School District No. 226 and Mount Morris Community Unit School District No. 261 are located in Ogle County, which lies in north central Illinois. Based on their respective property tax bases, schools in the Byron district receive significantly greater funding than schools in the Mount Morris district. "As a result of these large differences in school funding in the two districts, the children of Byron have far greater educational opportunity than the children of Mount Morris, with far less tax effort."

For example, Byron offers a starting salary for new teachers of $22,800 per year; Mount Morris can afford to offer only $16,000. Byron High School offers 187 courses; Mount Morris' high school offers only 113. Byron uses relatively new and current textbooks; Mount Morris uses textbooks that are 15 to 20 years old. Physical facilities at Byron are new and in good condition; Mount Morris lacks funds to remedy a $900,000 asbestos problem, repair leaky roofs, and replace flammable stage curtains and rotting football field bleachers.

Further, the disparities in educational resources and opportunity among Illinois school districts are some of the most severe in the nation. The complaint quotes from the 1989 Annual Report of the Illinois State Board of Education, which acknowledged that Illinois ranks sixth in the nation in educational funding disparities.

## DISCUSSION

I note at the outset some general principles that the majority recognizes. 174 Ill. 2d at 12-13. A court presumes legislation to be constitutional. Based on this presumption, the party challenging particular legislation has the burden of clearly establishing the alleged constitutional violation. *Nevitt v. Langfelder*, 157 Ill. 2d 116, 124 (1993); *People v. Shephard*, 152 Ill. 2d 489, 499 (1992).

The meaning of a constitutional provision depends on the common understanding of the citizens who gave the constitution life by ratifying it. This understanding is best determined by referring to the common meaning of the words used (*League of Women Voters v. County of Peoria*, 121 Ill. 2d 236, 243 (1987)), unless it is clearly evident that a contrary meaning was intended. *Coalition for Political Honesty v. State Board of Elections*, 65 Ill. 2d 453, 464 (1976). Where the text of the constitution is clear and unambiguous, the constitutional convention debates can have no bearing or effect on its interpretation. *Nevitt*, 157 Ill. 2d at 134; *People ex rel. Watseka Telephone Co. v. Emmerson*, 302 Ill. 300, 311 (1922).

If ambiguities remain after consulting the language of the provision, it is then appropriate to consult the convention debates to ascertain the meaning that the delegates attached to the provision. This is so because it is only with the consent of the convention that the provision was submitted to the voters in the first place. *League of Women Voters*, 121 Ill. 2d at 243-44. Also, "[i]n construing the meaning of a constitutional provi-

sion, it is appropriate and helpful to examine it in light of the history and condition of the times, and the particular problem which the convention sought to address by incorporating in the document the questioned provision." *Client Follow-Up Co. v. Hynes*, 75 Ill. 2d 208, 216 (1979).

Illinois Education Article

Plaintiffs contend, *inter alia*, that the public school funding scheme violates section 1 of the education article of the 1970 Illinois Constitution:

"§ 1. Goal—Free Schools

A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities.

*The State shall provide for an efficient system of high quality public educational institutions and services.* Education in public schools through the secondary level shall be free. There may be such other free education as the General Assembly provides by law.

The State has the primary responsibility for financing the system of public education." (Emphasis added.) Ill. Const. 1970, art. X, § 1.

Plaintiffs focus on the first sentence of the second paragraph (hereafter the education system provision). Plaintiffs allege, *inter alia*, that the education system provision requires the state to provide an education system that is "efficient" and "high quality." Plaintiffs allege that the Illinois public school funding scheme creates significant and growing disparities in educational services and resources throughout the state. According to plaintiffs, "[a]n educational funding system is not an 'efficient system' when some children have vast educational resources and others minimal. An education funding system is not a 'system of high quality' schools where only some children can go to them."

While I agree with plaintiffs' characterization of the "efficiency" aspect of the education system provision, I

hereafter focus my remarks on its "high quality" aspect. Plaintiffs argue that the state provides an educational system in which students in poor school districts are relegated to an educational opportunity that is devoid of high quality and is dramatically inferior to that offered in rich school districts. Plaintiffs claim that these disparities are so severe that the state fails to provide children in poor school districts "an efficient system of high quality public educational institutions and services."

## Jurisdiction

I initially address the issue of whether count III presents a justiciable issue, or whether it raises a nonjusticiable political question over which a court lacks subject-matter jurisdiction. When the parties seek adjudication of only a political question, they do not present a court with a justiciable controversy. *Flast v. Cohen*, 392 U.S. 83, 95, 20 L. Ed. 2d 947, 959, 88 S. Ct. 1942, 1950 (1968). Absent a justiciable controversy, a court lacks subject-matter jurisdiction. *People v. Capitol News, Inc.*, 137 Ill. 2d 162, 170 (1990). Agreeing with the State, the majority declares that the high quality aspect of the education system provision is not judicially enforceable. 174 Ill. 2d at 23-32.

I respectfully disagree. The following principles are fundamental:

"Under traditional constitutional theory, the basic 'sovereign' power of the state resides in the legislature. From this it follows, again in theory, that there is no need to grant any power to the legislature. All that need be done is to place such limitations as are desired on the legislature's otherwise unlimited power." G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 111 (1969), cited in *Client Follow-Up*, 75 Ill. 2d at 215.

Accordingly:

"limitations written into the Constitution are restrictions

on legislative power and are enforceable by the courts. On the other hand, constitutional directives to the legislature are considered as mandates or commands to the legislature to act, and it is generally held that the courts are powerless to enforce them." *Client Follow-Up*, 75 Ill. 2d at 215.

To determine the judicial enforceability of the education system provision, I first review section 1 of the education article of the 1870 Illinois Constitution, which stated:

"The *general assembly* shall provide a thorough and efficient system of free schools, whereby all children of this state may receive a good common school education." (Emphasis added.) Ill. Const. 1870, art. VIII, § 1.

Applying traditional constitutional theory to this section, this court consistently held that this section was a mandate to the legislature, requiring it to provide a thorough and efficient system of free schools. The same section was held also to limit the power of the legislature, in that the section limited the purpose of the system of free schools to that of providing a good education to all the children of the state. *People ex rel. Hepfer v. Price*, 310 Ill. 66, 73 (1923); *People ex rel. Goodell v. Chicago & Northwestern Ry. Co.*, 286 Ill. 384, 390 (1918).

This court concluded that section 1 of the 1870 Constitution's education article imposed only two judicially enforceable limitations on the legislature: that the schools were free, and that they were open to all without discrimination. *People v. Deatherage*, 401 Ill. 25, 30 (1948); *Fiedler v. Eckfeldt*, 335 Ill. 11, 23 (1929). However, the question of the efficiency and fairness of the school system was solely for the legislature to answer. *McLain v. Phelps*, 409 Ill. 393, 398 (1951); *Deatherage*, 401 Ill. at 31.

This court expressly based this conclusion on the plain language of section 1 of the 1870 Constitution's education article, which commanded the legislature specifically. In *Fiedler*, 335 Ill. at 23-24, this court cited

examples from other constitutional directives in the 1870 Constitution that were addressed specifically either to the General Assembly or to the Governor. Referring to section 1 of the 1870 Constitution's education article, the *Fiedler* court explained:

"The command of the constitution *is addressed to the General Assembly alone.* It was not a self-executing provision but required legislation to give it effect, and the responsibility and duty of providing the system and the means and agencies by which it should be made effective rest upon the General Assembly alone." (Emphasis added.) *Fiedler*, 335 Ill. at 23.

In contrast, the education system provision in the 1970 Illinois Constitution is expressly addressed to the "State" generally, as opposed to section 1 of the 1870 Constitution's education article, which was addressed to the "general assembly" specifically. I conclude that the education system provision in the 1970 Illinois Constitution is not a command addressed solely to the legislature, as was section 1 of the education article of the 1870 Constitution. Rather, the education system provision is a constitutional directive to the three branches of state government to fulfill their duties in accordance with their traditional roles under separation of powers principles. I base my conclusion on the plain language of the 1970 Constitution's education article, which is supported by the record of the constitutional convention.

Initially, the plain language of the 1970 Illinois Constitution's education article shows that the education system provision is addressed to the entire state government and not solely to the legislature. I earlier quoted section 1 of the current education article. The first paragraph of section 1 refers to education as a fundamental goal of *"the People of the State."* The sovereign power of the *entire* state government resides in the people of the state, who are vested with ultimate

sovereignty. In other words, the people of the state are "the source of all governmental power—not only all legislative power but all executive power and all judicial power." *People ex rel. Thomson v. Barnett*, 344 Ill. 62, 65 (1931); accord *Dodge v. Cole*, 97 Ill. 338, 355 (1881); 81A C.J.S. *States* § 35 (1977); 1 T. Cooley, Constitutional Limitations 81, 84 (8th ed. 1927).

It is correct and traditional to speak of the complete or unlimited power of the legislature, absent constitutional limitations. See, *e.g.*, *Client Follow-Up*, 75 Ill. 2d at 215; *Locust Grove Cemetery Ass'n v. Rose*, 16 Ill. 2d 132, 138 (1959); *Greenfield v. Russel*, 292 Ill. 392, 399 (1920); *Harris v. Board of Supervisors*, 105 Ill. 445, 450 (1882). However, it must be remembered that the people of the state, as the ultimate sovereign, vested such power in the legislature in the first place. *Barnett*, 344 Ill. at 66; *Hawthorn v. People*, 109 Ill. 302, 306 (1883); accord 72 Am. Jur. 2d *States, Territories, and Dependencies* § 41, at 440 (1974); 1 T. Cooley, Constitutional Limitations 175-77 (8th ed. 1927). Thus, I read the first paragraph of section 1 of the education article to declare that education is a fundamental goal of the entire state government.

The education system provision immediately follows, addressed simply to "The State." Why would the framers of the 1970 Illinois Constitution use the words "The State" if they intended to refer solely to the General Assembly, as the 1870 Constitution had expressly done? If "the State" were read as referring solely to the legislature, those plain words would be rendered superfluous. However, courts do not presume the existence of surplusage in constitutional or statutory construction. The rule of construction that each word, clause, or sentence must be given some reasonable meaning, if possible, applies especially to constitutional interpretation. *Coalition for Political Honesty*, 65 Ill. 2d at 466 (and cases

cited therein). The efficient system requirement, addressed to "The State," plainly refers to the preceding "People of the State," which, as I explained, refers to the entire state government.

I also note that the last sentence in the second paragraph of the education article refers specifically to the "General Assembly." Thus, if the framers of the 1970 Illinois Constitution had intended the education system provision to command the legislature alone, they could have named the legislature specifically.

My analysis of the education system provision, based on the plain language of the education article, should properly end here. See *Nevitt*, 157 Ill. 2d at 134. However, the State contends that the convention record reveals the opposite conclusion.

I disagree. The plain language of the education article is supported by the record of the constitutional convention. The Education Committee originally drafted the education system provision to read: "*To achieve this goal* [educational development as the 'paramount goal' of the people of the State], it shall be the duty of the State to provide for an efficient system of high quality public educational institutions and services." (Emphasis added.) 6 Record of Proceedings, Sixth Illinois Constitutional Convention 227, Committee Proposal No. 1 (hereinafter cited as Proceedings).

In presenting Committee Proposal No. 1 to the convention, committee member Samuel Patch repeatedly referred to the education system provision as a mandate to the "state." 2 Proceedings 764-65. Further, in response to questions on the proposal, Patch specifically said that the "state" was mandated "to carry out this goal—therefore, we said the *whole* state, that is, the executive branch as well as the General Assembly." (Emphasis added.) 2 Proceedings 766.

At the end of the debate, the phrase "the paramount

goal" was replaced with the phrase "a fundamental goal." 2 Proceedings 802-03. The proposed education article was sent to the Style, Drafting and Submission Committee (hereafter Style Committee). The Style Committee then modified the proposed education article as shown in pertinent part, with deleted language in brackets and added language underlined:

"A fundamental goal of the People of the State [shall be] is the educational development of all persons to the limits of their capacities.

[To achieve this goal, it shall be the duty of] The State shall [to] provide for an efficient system of high quality public educational institutions and services." 6 Proceedings 331 (Style Committee Proposal No. 11).

On the convention floor, delegates questioned the Style Committee chairman on whether the deletions to the education system provision, as originally drafted, changed the meaning of the sentence. 5 Proceedings 4120. The chairman answered:

"We didn't work a substantive change in it. If anything, I think we reaffirmed in a stronger manner by sentence 2, the intent of the [convention] on first reading.

Furthermore, sentence 2 follows sentence 1; the two are definitely interrelated. I don't think reasonable people would differ about that ***." 5 Proceedings 4121.

Thus, both the plain language of the education article and the convention record show that the education system provision is addressed to the entire state government and not solely to the legislature.

The State contends that the record of the constitutional convention clearly expresses the obvious intent of the framers that the education system provision is addressed solely to the legislature. The State cites several examples from the convention record.

The Education Committee originally drafted the first section, first paragraph of the education article to declare that education is the "paramount" goal of the people of the state. 6 Proceedings 227 (Committee Pro-

posal No. 1). The State points to the many delegates who expressed their concern that such a constitutional commitment would remove legislative flexibility in addressing other important matters. 2 Proceedings 769, 793, 798-802.

The State also points to the Education Committee's written explanation of the education system provision. The committee described it as a mandate. The committee noted that Illinois courts already used the concept of efficiency as a guide in validating school district boundary changes. The committee believed that it would be useful to continue this concept of efficiency and to add to it the idea of high quality. 6 Proceedings 234, Committee Proposal No. 1. During questioning on the convention floor, committee member Patch explained that the committee intended to reincorporate and maintain the continuity of case law on efficiency in the context of school district boundaries. 2 Proceedings 766. The State argues that this explanation clearly shows the obvious intent of the framers to continue this court's interpretation of section 1 of the education article of the 1870 Constitution as judicially nonenforceable. .

The State also points to the Education Committee's Proposal No. 2, which provided that "substantially all funds for the operational costs of the free public schools shall be appropriated by the General Assembly for the benefit of the local school districts," and which limited local school taxes to 10% of the amount that a school district received from the legislature. 6 Proceedings 295, Committee Proposal No. 2. In *Blase v. State*, 55 Ill. 2d 94, 98-100 (1973), this court recounted the debate on this proposal and how it ultimately resulted in the third paragraph of section 1 of the education article. Based on the convention record, this court held that the paragraph was merely hortatory and did not impose a specific, legally enforceable funding obligation on the General Assembly.

These references to the constitutional convention record do not constitute such a clear expression of an obvious intent of the framers as to allow this court to ignore the unambiguous constitutional language. Of course, the convention delegates were sensitive to the need for legislative flexibility. The delegates did not intend to constitutionally mandate any particular public school funding scheme. They also wanted to maintain the continuity of case law on efficiency in the context of school district boundaries.

Nevertheless, the plain language of the education article, additionally supported by the convention record, shows that the education system provision is not limited to the legislature, as was section 1 of the education article of the 1870 Constitution. Rather, the education system provision is a restriction that is directed at the entire state government.

The entire state government consists not only of the executive and legislative departments, as Delegate Patch stated (2 Proceedings 766), but also the judicial department. *People v. Commonwealth Edison Co.*, 367 Ill. 260, 273 (1937); *Devine v. Brunswick-Balke-Collender Co.*, 270 Ill. 504, 509 (1915); *Dodge*, 97 Ill. at 355.

Neither the plain language of the education article of the 1970 Illinois Constitution nor the convention record indicates that the framers intended to strip from the courts the power to determine whether the education system provision has been violated. Since the education system provision is addressed to the entire state government, and since the judiciary is a coordinate branch of state government, I would hold that the education system provision is judicially enforceable.

I acknowledge that this court reached a contrary conclusion in *Cronin v. Lindberg*, 66 Ill. 2d 47, 58 (1976). The court in *Cronin* mechanically applied this court's interpretation of the 1870 Constitution's education

article to the education system provision of the 1970 Illinois Constitution. See also *Polich v. Chicago School Finance Authority*, 79 Ill. 2d 188, 203-04 (1980); *Board of Education, School District No. 150 v. Cronin*, 51 Ill. App. 3d 838, 841-42 (1977). Such an application is erroneous. I would reverse *Cronin* on this point.

The majority concludes that the plain language of the education system provision, additionally supported by the convention record, "does not alter the roles or expand the powers assigned to the different branches of government by the constitution." 174 Ill. 2d at 26-27. I agree that it does not. However, as I have explained, where section 1 of the education article of the 1870 Illinois Constitution excluded the judicial and executive departments, the education system provision in the 1970 Constitution embraces all three branches of state government, including the judiciary. This court stated long ago:

> "To the judiciary is confided the power and the duty of interpreting the laws and the constitution whenever they are judicially presented for consideration. Hence it becomes our duty to determine what is the meaning of the laws passed by the legislature, and, also, whether those laws are such as the legislature was authorized by the constitution to pass." *People ex rel. Billings v. Bissell*, 19 Ill. 229, 231 (1857).

Accord *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177-78, 2 L. Ed. 60, 73-74 (1803).

Indeed, the judicial role of construing the constitution and determining if it has been violated is essential to our form of government. Accordingly, as the highest court of this state, it is the function and duty of the supreme court to act as the final arbiter of the Illinois Constitution. *People ex rel. Harrod v. Illinois Courts Comm'n*, 69 Ill. 2d 445, 458 (1977) (and cases cited therein); *Billings*, 19 Ill. at 232; accord *United States v. Nixon*, 418 U.S. 683, 704-05, 41 L. Ed. 2d 1039, 1062, 94 S. Ct. 3090, 3106 (1974).

The majority fears "legislating" in the field of public education. 174 Ill. 2d at 27. The majority concludes that the issue of disparities in educational services and resources among school districts is a political question and, thus, nonjusticiable. 174 Ill. 2d at 27-29. Indeed, the majority would deny the judicial department of state government jurisdiction over this issue even if the judiciary gave great deference to the legislative and executive departments in defining and regulating educational quality. 174 Ill. 2d at 29-31.

Out of fear of entering a "political thicket" (see *Colegrove v. Green*, 328 U.S. 549, 556, 90 L. Ed. 1432, 1436, 66 S. Ct. 1198, 1201 (1946)), the majority completely abdicates its constitutional duty to interpret the Illinois Constitution. The doctrine at issue here "is one of 'political questions,' not one of 'political cases.' The courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." *Baker v. Carr*, 369 U.S. 186, 217, 7 L. Ed. 2d 663, 686, 82 S. Ct. 691, 710 (1962).

Of course, courts cannot exercise legislative powers or compel their proper action. *Donovan v. Holzman*, 8 Ill. 2d 87, 93 (1956); *People ex rel. Huempfner v. Benson*, 294 Ill. 236, 239 (1920). However, "the judiciary has always had the right and duty to review all legislative acts in the light of the provisions and limitations of our basic charter. The mere fact that political rights and questions are involved does not create immunity from judicial review." *Donovan*, 8 Ill. 2d at 93; accord *Powell v. McCormack*, 395 U.S. 486, 549, 23 L. Ed. 2d 491, 532, 89 S. Ct. 1944, 1978 (1969). This court has not hesitated to invalidate long-standing practices under statutes that offend the Illinois Constitution. *Wolfson v. Avery*, 6 Ill. 2d 78, 95 (1955). It is the duty of the judiciary "to interpret laws and protect the rights of individuals against acts beyond the scope of legislative power." *Benson*, 294 Ill. at 239.

The best example of a "political case" is one involving legislative apportionment. The 1970 Illinois Constitution confers upon the supreme court original and exclusive jurisdiction over actions concerning redistricting the state legislature. Ill. Const. 1970, art. IV, § 3(b). The constitutional function of the supreme court "is to review what has been done by the body charged with that responsibility to determine if it has comported itself and discharged its responsibility in a lawful, legal manner. If it is determined that such has been done, that is the end of the matter." *People ex rel. Burris v. Ryan*, 147 Ill. 2d 270, 301 (1991) (Heiple, J., concurring).

In apportionment, this court's "historic function does not give us the right to indirectly exercise the legislative function by striking down a redistricting merely because we conceive that it might have been done better. The complicated considerations involved require careful study and a weighing of factors." *Donovan*, 8 Ill. 2d at 93. Rather, this court's role is limited solely to determining whether or not the legislature complied with the constitution:

> "The drawing of a reapportionment map is essentially a *political* and not a *judicial* process. It becomes judicial only if the parties who have the responsibility of drawing a map violate the law and produce a legally unacceptable map. A map that is *politically* unacceptable to one political party is not, for that reason, *legally* unacceptable. The courts must necessarily extend latitude to the political and governmental authorities in discharging their duties. Otherwise, the courts would become a political rather than a judicial institution." (Emphasis in original.) *Burris*, 147 Ill. 2d at 302 (Heiple, J., concurring).

Although this court is appropriately sensitive to its limited role, it has never abandoned its constitutional function to determine solely whether or not the legislature has complied with the constitution. *Donovan*, 8 Ill. 2d at 93; *People ex rel. Woodyatt v. Thompson*, 155 Ill. 451, 462, 480 (1895).

As with a reapportionment map, I believe that the judiciary cannot strike down the Illinois public school funding scheme merely because it might have been done better. However, it is the constitutional function of this court to determine solely whether or not the Illinois public school funding scheme comports with the education system provision.

Giving great deference to the legislative and executive departments of state government, I believe that the education system provision establishes a constitutional floor regarding educational adequacy. That provision imposes a constitutional responsibility on the entire state government. It is the duty of the judicial department to adjudicate the nature of that responsibility. See *Campaign for Fiscal Equity, Inc. v. State*, 86 N.Y.2d 307, 315, 655 N.E.2d 661, 665, 631 N.Y.S.2d 565, 569 (1995).

Despite the stark disparities in educational resources and opportunity alleged in this record, the majority concludes that the subject of educational quality is so important that only the political departments of state government, and not the judiciary, may play a role in outlining its parameters. 174 Ill. 2d at 28-29. I believe, however, that education is too precious a commodity for the judiciary to permit such a constitutional violation.

A public school education is not "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation." *Plyler v. Doe*, 457 U.S. 202, 221, 72 L. Ed. 2d 786, 801, 102 S. Ct. 2382, 2396 (1982). Courts have repeatedly recognized that a public school education is vital in two ways. First, it prepares individuals for participation as citizens; its deprivation has a lasting impact on the life of the child. Second, it maintains our basic institutions and, indeed, preserves the values on which our society rests. *Plyler*, 457 U.S. at 221, 72 L. Ed. 2d at 801, 102 S. Ct. at 2396-97; *Ambach v. Norwick*, 441 U.S. 68, 76-78, 60 L. Ed. 2d

49, 56-57, 99 S. Ct. 1589, 1594-95 (1979) (and authorities cited therein).

Regarding the importance of a public school education on the individual citizen, the following has been recognized:

" 'Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.' " *Plyler*, 457 U.S. at 222-23, 72 L. Ed. 2d at 803, 102 S. Ct. at 2397-98, quoting *Brown v. Board of Education*, 347 U.S. 483, 493, 98 L. Ed. 873, 880, 74 S. Ct. 686, 691 (1954).

Education also plays a "pivotal role *** in sustaining our political and cultural heritage" (*Plyler*, 457 U.S. at 221, 72 L. Ed. 2d at 802, 102 S. Ct. at 2397):

"The 'American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance.' [Citation.] We have recognized 'the public schools as a most vital civic institution for the preservation of a democratic system of government,' [citation] and as the primary vehicle for transmitting 'the values on which our society rests.' [Citation.] '[S]ome degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence.' [Citation.] *** In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a

fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests." *Plyler*, 457 U.S. at 221, 72 L. Ed. 2d at 801-02, 102 S. Ct. at 2397.

Despite the inestimable value of a public school education, the majority forever forecloses any judicial inquiry into whether the legislative and executive departments of our state government conform to the education system provision. Regardless of how abysmal educational resources and opportunity become in poor school districts, and how severe the disparities in educational quality grow among school districts, the judiciary is now powerless to enforce the constitution. I would hold that count III of plaintiffs' complaint presents a justiciable issue.

### Sufficiency of Count III

The appellate court read plaintiffs' complaint as demanding equal educational resources and services among all school districts, and the same instruction in all schools. 267 Ill. App. 3d at 21-22.

However, it is important to identify what plaintiffs allege. Plaintiffs do not allege that the education system provision mandates equal funding among all school districts, or uniform instruction in all schools. Rather, plaintiffs contend that the state cannot provide a high quality education to some students, but not to others. Plaintiffs allege that the Illinois public school funding scheme creates significant disparities between the richest and poorest school districts in the *quality* of educational resources and services provided. Plaintiffs further allege that, due to these disparities, the state fails to provide students in poor school districts "an efficient system of high quality public educational institutions and services." Ill. Const. 1970, art. X, § 1.

To the appellate court, plaintiffs' complaint did not

allege "that plaintiffs are being denied a minimally adequate education." The court read the complaint as resting "not on the adequacy of education in a district, but on differences in benefits and opportunities offered from district to district." 267 Ill. App. 3d at 21.

However, plaintiffs' complaint clearly alleges that the disparities between rich and poor school districts cause children in poor school districts to receive an inferior education. Plaintiffs allege that educational resources and services in poor school districts are inferior not only in comparison to those provided in rich school districts, but are intrinsically so inferior and inadequate as to harm "[e]ach of the plaintiff school districts and each of the plaintiff schoolchildren" and to violate the education system provision.

Further, the appellate court appears to have rejected plaintiffs' underlying correlation between educational resources and services and educational quality. The court concluded:

> "To allege that certain educational resources are unavailable in poorer school districts, or inferior to those in wealthier districts, does not compel the conclusion that the funding provided by the State's financing system is insufficient to provide an adequate education." 267 Ill. App. 3d at 22.

I flatly reject such a conclusion. I presently accept the following propositions. A correlation exists between educational resources and educational quality or opportunity. Lesser educational resources, below a certain level, result in lower educational quality or opportunity. Conversely, the improvement of public education funding, up to a certain level, would correlatively improve educational quality and uniformity of opportunity. These propositions are widely recognized. See, *e.g.*, *Edgewood Independent School District v. Kirby*, 777 S.W.2d 391, 393 (Tex. 1989); *Board of Education, Levittown Union Free School District v. Nyquist*, 57

N.Y.2d 27, 38 n.3, 439 N.E.2d 359, 363 n.3, 453 N.Y.S.2d 643, 647 n.3 (1982); *McDaniel v. Thomas*, 248 Ga. 632, 637-38, 285 S.E.2d 156, 160-61 (1981); Note, *State Constitutional Analyses of Public School Finance Reform Cases: Myth or Methodology?*, 45 Vanderbilt L. Rev. 129, 129-32 (1991); J. Kozol, Savage Inequalities: Children in America's Schools 40-82, 236 (1991) (discussing, *inter alia*, disparities in educational funding, services, and resources, and corresponding disparities in educational quality, between Chicago public schools and suburban school districts); see generally C. Tesconi & E. Hurwitz, Education for Whom? The Question of Equal Educational Opportunity (1974).

Indeed, these propositions form the very premise upon which the Illinois public school funding scheme is based. The state's supplementary aid is "designed to ameliorate in part the dollar disparities generated by a system of local taxation." *Robinson v. Cahill*, 62 N.J. 473, 481, 303 A.2d 273, 277 (1973); A. Schwartz, *Illinois School Finance—A Primer*, 56 Chi.-Kent L. Rev. 831, 836-38 (1980). However, I acknowledge that these propositions are not universally accepted. See, *e.g., San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 42-43, 36 L. Ed. 2d 16, 48-49, 93 S. Ct. 1278, 1302 (1973); *Hornbeck v. Somerset County Board of Education*, 295 Md. 597, 639, 458 A.2d 758, 780 (1983); *Lujan v. Colorado State Board of Education*, 649 P.2d 1005, 1018 (Colo. 1982).

True, the mere *allegation* of lack of educational resources does not compel the conclusion that the public school funding scheme *actually* fails to provide an adequate education. Nonetheless, it cannot be said that count III is legally insufficient. It must be remembered that this case comes to us from the dismissal of plaintiffs' complaint. A complaint should not be dismissed for failure to state a claim unless it clearly appears that no set

of facts could be proved under the allegations that would entitle the party to relief. *Meerbrey,* 139 Ill. 2d at 473; *Ogle v. Fuiten,* 102 Ill. 2d 356, 360-61 (1984).

After carefully reviewing count III, I conclude that the complaint states a cause of action. I would reverse the trial court's dismissal of count III of plaintiffs' complaint.

### Available Relief

I would hold only that count III of plaintiffs' complaint states a cause of action, emphasizing that this holding would not have been a final judgment on the merits. At trial, plaintiffs would have had the burden of presenting evidence to support their allegations. However, under the circumstances of this case, I believe that it is appropriate to note what relief I believe would have been available to plaintiffs. See *Horton v. Meskill,* 172 Conn. 615, 650, 376 A.2d 359, 375 (1977).

If the trial court had ultimately entered judgment in favor of plaintiffs, then it would have been up to the legislative and executive departments of state government to recreate and reestablish a public school funding scheme that would comply with the Illinois Constitution. The trial court could not have instructed the General Assembly to enact any specific legislation or to raise taxes. Likewise, the trial court could not have instructed the Governor how to implement or enforce any public school funding policy or plan. The trial court could not have retained jurisdiction of the case to enforce the court's orders.

It is the duty of the judicial department of Illinois government only to determine what the Illinois Constitution requires. It is the duty of the legislative and executive departments to carry out that requirement. I am confident that they would have proceeded with their duty if they had been called to do so. See *Bismarck Public School District No. 1 v. State,* 511 N.W.2d 247, 263

(N.D. 1994); *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 212, 214 (Ky. 1989); *Edgewood*, 777 S.W.2d at 399.

## CONCLUSION

The legislative and executive departments of Illinois government need such a call. As of this writing, it is questionable whether they have met their constitutional duty under the education system provision. According to one study, in the 1989-90 school year, only one state had a greater level of disparity than Illinois in resources available to elementary and secondary school districts. Research Note, *Variations in Expenditures Per Pupil Within the States: Evidence From Census Data for 1989-90*, 19 J. Educ. Fin. 358 (1994).

Unfortunately, by holding that the high quality aspect of the education system provision is nonjusticiable, the majority today abandons its responsibility to interpret the Illinois Constitution. The judiciary joins the legislative and executive departments in failing to fulfill our state government's constitutional responsibility of providing for an efficient system of high quality public education.

For the foregoing reasons, I would reverse the judgments of the appellate court and the circuit court of Cook County as to count III. Accordingly, I respectfully dissent from that part of the majority opinion that upholds the trial court's dismissal of that count.